784 F.Supp. 648 (1992)
CONOPCO, INC., Plaintiff,
v.
MAY DEPARTMENT STORES COMPANY, et al., Defendants.
No. 90-1475C(3).
United States District Court, E.D. Missouri, E.D.
January 2, 1992.
*649 *650 *651 *652 *653 *654 Harry O. Moline, Moline Ottsen Mauze Leggat & Shostak, St. Louis, Mo., Berj A. Terzian, Joseph Diamante, Peter D. Vogl, Darren Saunders, Pennie & Edmonds, New York City, for plaintiff.
Stephen J. Horace, St. Louis, Mo., for The May Dept. Stores Co.
Jerome C. Simon, Moser & Marsalek, St. Louis, Mo., for Kessler Containers Ltd.
Edward J. Hejlek, J. Bennett Clark, Senninger Powers Leavitt & Roedel, St. Louis, Mo., for Venture & May Dept. and The Benjamin Ansehl Co. & Kessler Containers Ltd.
Ralph W. Kalish, Jr., Alan S. Nemes, Kalish & Gilster, St. Louis, Mo., for Venture Stores.

MEMORANDUM
HUNGATE, District Judge.
This matter is before the Court to determine the merits of plaintiff's claims after an eight-day bench trial.
Pursuant to 35 U.S.C. ง 271, et seq., and 15 U.S.C. ง 1121, plaintiff alleges substantial claims for patent infringement and trademark and trade dress infringement. Plaintiff is the creator and manufacturer of the original VASELINE INTENSIVE CARE LOTION, as well as a revised version of that product. Plaintiff contends that defendants have sold and are selling their own skin care lotion which infringes plaintiff's recently patented lotion formula. Plaintiff contends further that defendants have sold and are selling the infringing product in a package simulating the overall shape and appearance of plaintiff's revised Intensive Care Lotion packaging, thereby infringing on plaintiff's trademark and trade dress rights. Defendants counter that they are not liable to plaintiff because no infringement has occurred. Defendant Ansehl counterclaims against plaintiff, alleging bad faith prosecution of plaintiff's patent infringement claim.
Plaintiff seeks monetary and injunctive relief, as well as loss of profit damages, *655 prejudgment interest, attorney's fees, and costs.
Having carefully considered the pleadings, testimony, witnesses, documents, and evidence, and being fully advised in the premises, the Court renders the following findings of fact and conclusions of law.

Findings of Fact
1. Plaintiff, Conopco, Inc., doing business as Chesebrough-Pond's USA Co. ("Chesebrough") is incorporated in New York and has its principal place of business at 33 Benedict Place, Greenwich, Connecticut.
2. Defendant, May Department Stores, Inc. ("May") is incorporated in New York and has its principal place of business at 611 Olive Street, St. Louis, Missouri.
3. Defendant, Venture Stores, Inc. ("Venture") is incorporated in Delaware and has its principal place of business at 2001 East Terra Lane, O'Fallon, Missouri.
4. Defendant, The Benjamin Ansehl Company ("Ansehl") is incorporated in Missouri and has its principal place of business at 1555 Page Industrial Boulevard, St. Louis, Missouri.
5. Defendant, Kessler Containers, Ltd. ("Kessler") is incorporated in Missouri and has its principal place of business at 1480 Page Industrial Plaza, St. Louis, Missouri.
6. In 1969, Chesebrough introduced VASELINE INTENSIVE CARE LOTION ("VICL").
7. Chesebrough introduced VICL with a therapeutic image, thus distinguishing it from the other leading cosmetic skin care lotions.
8. The 1969 VICL appeared in its regular "flavor." There are currently four "flavors" or styles of VICL: regular, herbal and aloe, extra strength, and sensitive skin. The regular VICL has always been packaged in a yellow bottle with a blue and green label. This color combination was designed to link VICL to the over one-hundred-year-old reputation of Chesebrough's Vaseline Petroleum Jelly product which is packaged in the same colors.
9. Since its inception in 1969, VICL has been the leading brand in the hand and body lotion market. VICL's sales have steadily increased since its introduction. In 1990, VICL's sales exceeded $109,000,000.
10. In 1974, Chesebrough introduced the herbal and aloe flavor. This flavor was advertised as a therapeutic product also. The extra strength flavor was introduced in 1977 and was directed toward people with exceptionally dry skin. Again, the advertising and promotion focused on therapeutic imagery.
11. Chesebrough introduced the sensitive skin flavor in 1987 as a therapeutic product for people with highly sensitive skin.
12. From 1969 through June 1989, VICL was packaged in a tapered oval bottle which was commonly used by the trade. Chesebrough had no proprietary right or interest in this bottle shape. At times, Chesebrough sold these tapered oval bottles to others.
13. In the early to mid-1980's, Chesebrough began to face substantial competition from major competitors with brands such as Wondra, Nivea, Curel, Jergens Aloe & Lanolin, and Keri. These brands were manufactured and marketed by major competitors such as S.C. Johnson (Curel), Bristol Myers (Keri), and Proctor and Gamble (Wondra). Chesebrough's competitors offered these new products as therapeutic alternatives to the VICL product.
14. Since the late 1970's, Chesebrough conducted annual tracking studies to examine consumer perception of VICL. After major competitors had positioned and promoted their lotions as therapeutic alternatives to VICL, Chesebrough's tracking studies showed that consumers' perceptions of the VICL efficacy were not as positive as they were previously. This erosion in the consumers' confidence in the VICL efficacy was of great concern to Chesebrough since the VICL product was its flagship product and the sales leader in the hand and body lotion market.
15. In 1986, Chesebrough commissioned a comprehensive study referred to as the *656 Market Segmentation Study. This study confirmed that (1) an erosion in VICL's therapeutic imagery had occurred; (2) more consumers were primarily concerned with the therapeutic value of skin care lotions as opposed to their cosmetic value; (3) the VICL product had appeal to a wide range of consumers, from those primarily motivated by price considerations to those who were motivated to purchase because of therapeutic reasons; and (4) the proliferation by major new entrants into the market had eroded the VICL product's therapeutic image.
16. At the time this study was done, none of VICL's major competitors, such as Nivea, Jergens, Curel, and Keri, simulated the trade dress or packaging of the VICL product. Nevertheless, each entrant successfully competed with Chesebrough's VICL product.
17. In the mid 1980's, the private label sector comprised approximately 5% of the total skin care lotion market. In this 5% market sector, there were over 100 separate brands. Thus, on the average, each private label product represented less than .05% of the market.
18. In or about 1986, the most serious concern facing Chesebrough was the erosion of VICL's therapeutic appeal to consumers. Accordingly, senior management, including the president of Chesebrough, decided to relaunch or restage the product. The purpose of the VICL relaunch was to restore the therapeutic image of the VICL product by creating a totally unique and distinctive packaging and by developing an improved formula for the lotion.
19. Chesebrough's senior management wanted the VICL packaging to have an appearance which would differentiate VICL from the store brand lotions. Also, Chesebrough's senior management wanted to create a package which would be protectible and enforceable against all potential future infringers, including but not limited to private label manufacturers.
20. To this end, Stuart Kipperman and Myron Smith, Chesebrough's in-house package designers, began to work on creating a new VICL package in 1987. By mid-1987, Chesebrough's in-house package department had made hundreds of drawings of proposed new bottle designs. From these drawings, Chesebrough produced clay models of various bottle shapes. These bottle shapes were reviewed and considered by Chesebrough's top management, including its president. From the many bottle shapes, Chesebrough's senior management selected one particular bottle shape which was considered the most unique and aesthetically appealing.
21. To insure that the new bottle shape would be regarded as unique by consumers and would help enhance VICL's therapeutic image, Chesebrough embarked upon a series of experimental consumer tests. In the first of these tests conducted in late 1987, consumers were shown photographs of the clay model of the new bottle shape (with the label used on the then current VICL tapered bottle). Consumers overwhelmingly perceived this new bottle as being different in appearance from any other bottles.
22. In February 1988, Chesebrough conducted an important test on its new packaging. Both prior users and non-users of the VICL product participated in the experiment. These users and non-users of VICL were given the new bottle containing the then current lotion. The respondents were also given the old tapered bottle containing the same lotion. Both the new and old bottles had the label which was then being used on the old bottle, since plaintiff wanted to investigate the effect the new bottle shape had on consumers.
23. These tests showed that the new bottle shape had an important effect upon consumers' perceptions of the lotion itself. Consumers believed that the lotion in the new bottle was more therapeutic even though the lotion contained in both the new and the old bottle was identical. Chesebrough's personnel and documents refer to this phenomenon as the "halo" effect since the bottle shape itself affected consumers' perceptions on the lotion's efficacy. Consumers also found that the new bottle shape was different and unique.
24. Throughout 1988, Chesebrough continued its research on the bottle to insure *657 that the bottle had "shelf presence," that is, to verify it could be seen easily by consumers on the shelf. Included in this research was an Eye Perception Test, conducted at significant expense to Chesebrough, which investigated consumers' ability to pick out the new VICL packaging from an array of hand and body lotion products found on a typical store shelf. Chesebrough's research confirmed that the new bottle design had great store visibility and shelf presence.
25. In the mid-1980's, Chesebrough's package designers also revised VICL's label in order to further convey a modern and therapeutic image. The designers enlarged and broadened the label to give it a "billboard" look. The trademark VASELINE was moved from the bottom half of the label to the top. They also enlarged the well-known INTENSIVE CARE trademark, a name which evokes a therapeutic image. Chesebrough also continued to use the blue and green color combination that it used for VICL for twenty years in order to maintain and build upon its previously existing equity in the marketplace.
26. In 1988, senior management instructed its Research and Development ("R & D") Department to create an improved formulation for VICL. The goal was to create a lotion which was less greasy while maintaining the lotion's thickness and smooth skin feel. The research team was headed by Dr. Dipak Ghosh who oversaw several chemists, including Philip Ziegler.
27. The R & D Department began to experiment with isoparaffin, a hydrocarbon, and DEA-cetyl phosphate, a surfactant. After hundreds of experiments using these two ingredients alone and in combination with other ingredients, the R & D Department learned that the combination of isoparaffin, which is a water thin, non-viscous liquid, and DEA-cetyl phosphate, a solid, had an unexpected boosting effect upon the viscosity of the lotion. Because these two ingredients in combination increased the viscosity of the lotion, the amount of mineral oil, a heavy greasy substance, could be decreased. The net effect is a lotion which is less greasy, but just as thick as the old VICL.
28. After this discovery, Chesebrough conducted various tests comparing the old formula with the new formula to insure consumer acceptance of the new formula. Consumers favored the lotion which contained isoparaffin, DEA-cetyl phosphate and glycerin at a proportion of 5.5% of the entire lotion.
29. For the revised VICL formula, Chesebrough wanted to increase the level of glycerin, the primary healing ingredient. The old VICL formula contained 5% glycerin. In order to advertise and promote the VICL product as "new and improved," it was necessary to increase the amount of the active ingredient glycerin by 10% over the prior product.
30. Based upon its consumer testing showing a preference for lotion having isoparaffin and DEA-cetyl phosphate and the fact that Chesebrough wanted to advertise the revised VICL as "new and improved," Chesebrough decided to use the formula containing 5.5% glycerin, isoparaffin and DEA-cetyl phosphate. Although glycerin is a heavy, sticky material, the viscosity effect of the isoparaffin/DEA-cetyl phosphate combination permitted Chesebrough to increase the glycerin content and substantially decrease the mineral oil content, thus achieving a less greasy lotion with more healing ingredients.
31. In order to advertise and promote the new and improved formula, Chesebrough placed a red flag on its label which states "new and improved." Chesebrough could make this statement due to its having increased the amount of glycerin from 5% to 5.5%
32. Chesebrough is the owner of U.S. Trademark Registration Nos. 44,790 and 140,345 for VASELINE and No. 864,662 for INTENSIVE CARE. These registrations are valid and subsisting and have become incontestable under Section 15 of the U.S. Trademark Act.
33. On April 17, 1989, Chesebrough filed 15 design patent applications to obtain protection for the VICL bottle shape and similar shapes. On July 9, 1991, U.S. Patent *658 No. D318,037 issued to Chesebrough for a bottle shape substantially identical to its new bottle shape.
34. On June 22, 1989, four Chesebrough employees filed a utility patent application to protect their invention, namely the use of isoparaffin and DEA-cetyl phosphate in aqueous cosmetic emulsions. On July 3, 1990, the U.S. Patent Office granted Chesebrough, as assignee, U.S. Patent 4,939,179 ("the '179 patent") for "Cosmetic Emulsions With Hydrocarbon Thickening Agents."
35. In June 1989, Chesebrough began aggressively to promote and advertise its restaged VICL product. Media events were scheduled whereby the media and trade were presented with the revised VICL product as well as an explanation of the twenty-year history of the VICL product itself.
36. In July 1989, the VICL product was shipped to the trade throughout the country. By early fall 1989, the product was on the shelves of virtually every major retail and drug store in the United States. Beginning in the fall of 1989 through March 1990, Chesebrough spent over $37 million in advertising and promotion on the revised VICL. The advertising also included nationwide advertising on national television networks. The VICL relaunch achieved a new Chesebrough sales record for a six-month period. For the six-month period following its introduction, gross sales of the new VICL product totalled over $69 million. In the previous year, sales for the same six-month period were less than $45 million.
37. In December 1989, VICL also introduced its revised VICL product in a 20 ounce bonus pack, which provides consumers with 33% more lotion free. With the bonus pack, consumers received 20 ounces of VICL for the price of 15 ounces. Since the use of the word "free" is strictly controlled by Federal Trade Commission regulations, the 20 ounce bonus pack is shipped only one month per year. The bonus pack is a promotional device used by Chesebrough to stimulate sales, increase usage, and attract new users. The VICL bonus pack was sold in retail stores throughout the United States.
38. During the late spring of 1989, while Chesebrough began to develop the revised VICL, Venture was a division of May. May provided numerous services to Venture, including legal services and import services. All cash collected by Venture in excess of operating expenses was transferred to May on a daily basis.
39. In November 1990, Venture was divested from May and its stock was publicly traded. In the agreement between May and Venture, Venture's customers are permitted to use May's Famous-Barr credit card to purchase products at Venture. May receives a 3% service charge from Venture from all sales which utilize the Famous-Barr credit card.
40. According to the Venture prospectus used to announce the divestiture, May continues to offer certain services to Venture, including import purchasing of products. In addition, May has given to Venture a royalty-free license to use certain of May's trademarks.
41. Venture sells many hundreds of national brand items such as VICL, as well as hundreds of private label items under its own trademarks. These items are routinely packaged and labeled by Venture in a manner to allow Venture customers to identify them as being comparable, but lower-priced, alternatives to the high-volume national brands.
42. In January 1990, Venture began selling a new formula skin care lotion in a package which simulated the overall shape and appearance of the revised VICL packaging. The new Venture skin care lotion product contained isoparaffin and DEA-cetyl phosphate. Beginning in January 1990, up to and including May 1991, Venture sold and distributed its new skin care lotion packaged solely in a 20 ounce pack.
43. In March 1990, Chesebrough discovered that Venture was selling its skin care lotion product in a revised bottle which closely mimics the new packaging developed by Chesebrough for its VICL product.
*659 44. May's in-house legal department advised and represented Venture at the outset of this controversy. On March 23, 1990, Chesebrough's trial counsel sent a cease and desist letter to Venture accusing Venture, inter alia, of trademark and trade dress infringement. The letter was also sent to May's president.
45. On April 2, 1990, Ms. Lerinda Saint, in-house counsel for May, responded to the March 23 cease and desist letter by stating that May needed more time to investigate the matter. The April 2 letter erroneously identified Venture as a division of May. As of the date of this letter, Venture was a wholly-owned subsidiary of May.
46. On May 2, 1990, Ms. Saint and her supervisor, Margaret McNally, senior counsel to May and an attorney who handled intellectual property matters for Venture since 1981, prepared a response to Chesebrough's cease and desist letter. The April 17 letter was prepared on May's stationery and generally denied any wrongdoing. Ms. Saint signed the letter and copied Ms. McNally.
47. Defendant Ansehl is engaged in the manufacture and sale of cosmetics and toiletries. Ansehl produces products for retailers which sell house brands or private label cosmetics and toiletries.
48. Ansehl manufactures a skin care lotion containing isoparaffin and DEA-cetyl phosphate for Venture, K-Mart, Woolworth, Ames, Target, Wal-Mart, McCrory, and other retailers. These products supplied by Ansehl are packaged in containers which mimic the shape and appearance of the VICL bottle, including the yellow, blue, and green color combination of the VICL packaging. Prior to 1989, the Venture lotion was sold in yellow "tapered oval" bottles, the same bottles in which VICL was then packaged.
49. Defendant Kessler knowingly manufactured and continues to manufacture for Ansehl a bottle which mimics the shape of the revised VICL bottle.
50. Ansehl has been a Kessler customer for over eight years. Ansehl fills the bottles purchased from Kessler with skin care lotion, caps and labels the bottles, and sells the lotion to its customers. Kessler has produced over 100 different bottles of various shapes and sizes for its customers. Kessler never manufactured a bottle in the exact shape and configuration of the accused bottle, prior to Ansehl's request that it do so. After this lawsuit was commenced, Ansehl indemnified Kessler for liability it may incur as a result of its manufacture and sale of the accused bottle. Kessler continues to manufacture for and sell to Ansehl the bottle used to package Venture's revised formula skin care product.
51. Within Ansehl, there existed an inner management group known as the Business Planning Group. This group included Executive Vice President William Bond; Kip L. Bowers, the Manager of Health and Beauty Aids; Dennis Wiele, the Chief Financial Officer; and Jay Shoemaker, President of Ansehl in 1989.
52. In a memorandum dated January 16, 1989, Mr. Bond informed Messrs. Bowers, Wiele and Shoemaker and Norma Badolato, a buyer for Ansehl, that Chesebrough was revising its VICL packaging and that this revision would definitely impact on Ansehl's business. The memo also contained photographs of the revised VICL packaging even though the revised VICL trade dress was not shipped to stores until July 1989, six months later.
53. Mr. Bond testified that he received the photographs from a buyer at Caldor, which at that time was wholly-owned by May.
54. After the January memo, Ansehl's Business Planning Group's records manifest a clear attempt to obtain the revised VICL bottle. Mr. Bowers testified that it was a major directive to obtain the new VICL bottle. Mr. Bowers testified further that Ansehl realized that the introduction of the revised VICL packaging would have a profound effect on Ansehl's business.
55. Mr. Bowers testified that he was instructed by Mr. Bond to make the revised skin care packaging as close as possible to the VICL packaging. Mr. Bond rejected *660 early artwork which he did not believe was close enough to the VICL trade dress.
56. Ansehl's revisions included the closure of the bottle as well. Mr. Bond testified that there were numerous discussions at Ansehl concerning Chesebrough's oval closure or cap. Mr. Bond wanted Ansehl's product to have an oval closure or cap.
57. Ansehl realized that producing a bottle with an oval closure would be an expensive process. However, Mr. Bowers testified that Ansehl believed that the expense would be worthwhile because the closer it came to the appearance of the VICL bottle, the better its chances were to obtain major customers.
58. Mr. Bowers admitted that Ansehl maintained VICL bottles at its headquarters for business purposes. He further admitted that he and his staff reviewed the revised VICL packaging when designing the revised Ansehl packaging. Mr. Bowers admitted also that while designing Ansehl's revised packaging, he took into consideration the shape of the revised VICL product.
59. Mr. Bowers further admitted that he had never seen a bottle in the particular shape of the VICL bottle before his involvement in redesigning Ansehl's bottle. He also admitted that there are numerous ways to make a bottle shape.
60. Although defendants have claimed that there are no exclusive rights in bottle shapes, Mr. Bowers admitted that Ansehl wanted to obtain exclusive rights in the mold for its particular bottle shape because it wanted to have exclusive control over that particular mold. He further testified that Ansehl wanted exclusive rights in the bottle shape produced by the mold.
61. Mr. Bowers testified that he used photographs of the revised VICL product when designing Ansehl's 20 ounce bonus pack.
62. Ansehl eventually selected Compact Mould Company to produce the mold for its 20 ounce bottle. This is the same company which produced the mold for the revised VICL product.
63. Ansehl realized that Chesebrough was going to produce a 20-ounce bonus pack for its relaunch and wanted to have its 20-ounce bonus pack version available to the trade at the same time that Chesebrough's 20-ounce product would be sold to the trade.
64. Mr. Bowers admitted that the Venture name was prominently displayed on Venture's skin care lotion packaging for the past four years. Skin care lotion products sold by Venture have displayed the Venture name in bold lettering on the front label.
65. The revised Venture skin care lotion package does not contain the Venture name on the front label. Mr. Bowers alleged that Venture did not have the right to use the name on the product. No support was established in the record for this position. Ms. McNally, May's intellectual property counsel, testified that she reviewed the Venture Prospectus for accuracy. The prospectus clearly states that Venture owns all rights in and to the Venture name and mark. Furthermore, Ms. McNally admitted that the Venture name is used by Venture on other skin care lotions. At her deposition in April 1991, she testified that she did not know about any alleged problem concerning the right to use the Venture name. Furthermore, she admitted at trial that she never responded to any "cease and desist" letters concerning the use of the Venture name. At trial, Ms. McNally claimed that she recently heard about "some problem about the Venture name." However, she provided no details.
66. The Venture name was not displayed prominently on the accused bottle. The Venture name appears on the accused bottle only in very small print on the back label in the distributor statement. Significantly, Venture's prior skin care lotion product (which prominently showed the Venture name on its front label), contained the distributor statement on the front label. However, on the revised Venture package, the distributor statement appears on the back label. Mr. Bowers could not explain why this change had occurred, even though *661 he had primary responsibility for redesigning the package.
67. Other witnesses completely contradicted themselves concerning the alleged problem over the Venture name. Mr. Bond, Ansehl's vice-president, testified that he relied upon Mr. Patrick Smith, a buyer for Venture, to determine whether the Venture name could be used. However, Mr. Smith testified that he relied solely upon Ansehl for information concerning whether his company could use the Venture name.
68. It is undisputed that the Venture name has been used for over 20 years. Further, the company has been publicly traded on the New York Stock Exchange beginning in November 1990. Ms. McNally confirmed that she never received a cease and desist letter from any company concerning Venture's use of its name on a skin care lotion product.
69. Mr. Bowers admitted that when he decided to use the color combination of yellow, blue, and green, he was aware that these colors were used by Chesebrough for its revised VICL product and that he did not consider using any other colors. He also admitted that he was aware that Chesebrough's product had a red slanted diagonal flag when he prepared the label which also uses a red diagonal flag.
70. Regarding the "33% More Free" portion of the label, Mr. Bowers testified clearly, and the record supports his testimony, that this product was sold by Venture from January 1990 up to and including May 1991. During this period of time, Venture did not sell a 15-ounce version of the revised product with the new ingredients. Therefore, during this period of time, consumers could not actually receive "33% more free" since the 15-ounce version of the product was not available. Mr. Bowers admitted that he did not check whether extended sales of "bonus packs" would violate Federal Trade Commission rules which strictly limit use of free product offerings to a specific time period.
71. The revised front label of the Venture skin care lotion contains the phrase "Compare to Vaseline Intensive Care Lotion". Mr. Bowers testified that the idea to use the "Compare to" statement came from Mr. Gulledge of Venture stores. Mr. Gulledge wanted the statement printed on a red background so that it would "stand out." Mr. Bowers testified that the wording of the "Compare to" was his idea. He testified that neither he nor Mr. Gulledge wanted to use the term "Compare to National Brand," although this phrase was used on other Venture products.
72. Mr. Gulledge testified that he was offered temporary stickers stating "Compare to National Brand" which could be applied to the Venture packaging in the interim while the Venture labels were being prepared. Mr. Gulledge completely rejected this offer because he wanted the statement "Compare to Vaseline Intensive Care" to appear on the Venture bottle.
73. Both Mr. Gulledge and Mr. Bowers admitted that while developing the comparison statement for Plaintiff's Exhibit 1, they realized and understood that the names Vaseline and Intensive Care were well-known to the public.
74. Mr. Bowers admitted that he wanted the trademarks in the "Compare to" statement to be large enough to be worthwhile.
75. The revised Venture skin care lotion package contains a disclaimer printed in small type on the bottom of the rear label which states the following: "Venture Skin Care Lotion is not manufactured or distributed by Chesebrough-Ponds Inc., distributor of Vaseline Intensive Care Lotion." Mr. Bowers testified that it was his sole idea to use the disclaimer. He further testified he understood that the front of a skin care lotion package is more important to consumers since this is what they focus upon when viewing the product on store shelves. However, he never considered placing the disclaimer on the front of Venture's revised bottle. Also, he never considered changing the print size or coloring of the disclaimer.
76. Mr. Bowers testified he realized that statements placed on consumer packaging have legal consequences. However, he did not obtain an opinion of counsel *662 concerning the legality of the "Compare to," the use of the statement "33%" More "Free," the use of the disclaimer, or other any aspect of Ansehl's revised skin lotion packaging.
77. Mr. Gulledge confirmed that he did not obtain any legal opinions concerning the comparison statement on the revised Venture bottle.
78. Ms. McNally, who from 1989 through 1990, served as intellectual property counsel for Venture, confirmed that neither she nor anyone in May's legal department rendered an opinion on the legality of any aspect of the Venture Skin Care Lotion packaging.
79. Mr. Bond instructed his employee, Sol Benkendorf, a laboratory technician, to match the ingredients of VICL.
80. The parties stipulated that prior to December 1989, neither Ansehl nor Venture sold a skin care lotion which contained isoparaffin or DEA-cetyl phosphate.
81. Mr. Benkendorf testified that in December 1989, he copied the ingredient list found upon the ingredient list on the label of the revised VICL bottle in order to "match" this new ingredient list. From a comparison of the old and new VICL ingredient lists, Mr. Benkendorf learned that isoparaffin and DEA-cetyl phosphate salt were the only new ingredients in the new lotion.
82. In order to insure that he had achieved a match for the VICL product, Mr. Benkendorf retained two outside testing laboratories to confirm that Ansehl's infringing lotion product matches the VICL product.
83. On December 16, 1989, plaintiff began placing the patent pending symbol on the VICL containers.
84. In December 1989, Ansehl made its first batch of lotion containing isoparaffin and DEA-cetyl phosphate in ratios of 40:1. From January 1990 up to and including March 1990, Ansehl began to supply customers, such as Venture and Target, with a skin care lotion having isoparaffin and DEA-cetyl phosphate in a relative ratio of 40:1. Mr. Benkendorf arrived at this ratio by inserting into the revised Ansehl lotion the isoparaffin and DEA-cetyl phosphate salt components in the same positions and relative amounts as he observed these new ingredients occupied in the new VICL lotion ingredients listing.
85. Mr. Benkendorf testified that in March 1990, he changed Ansehl's lotion containing isoparaffin and DEA-cetyl phosphate from a ratio of 40:1 to a ratio of 162.9:1. Mr. Benkendorf claimed that the change was mandated by a shortage of DEA-cetyl phosphate. However, Ansehl's inventory records indicate that Ansehl had substantial amounts of DEA-cetyl phosphate on hand.
86. From February 2, 1990, up to and including April 1991, Ansehl continued to supply Venture and other customers with a skin care lotion containing isoparaffin and DEA-cetyl phosphate in a relative ratio of 162.9:1. Also, in June 1990 through February 1991, Ansehl produced and shipped skin care lotion containing isoparaffin and DEA-cetyl phosphate in ratios of 20:1.
87. On July 3, 1990, the '179 patent was issued by the U.S. Patent and Trademark Office.
88. From July 3, 1990, to date, Ansehl sold 2,317,944 bottles of skin care lotion containing isoparaffin and DEA-cetyl phosphate in ratios of 162.9:1, 40:1, and 20:1.
89. On August 2, 1990, Chesebrough filed suit alleging infringement of the '179 patent, trademark infringement, and trade dress infringement. Despite having actual notice of Chesebrough's claims, the defendants continued to produce and sell a skin care lotion containing isoparaffin and DEA-cetyl phosphate.
90. In its patent application, Chesebrough disclosed the existence of the Coopersmith et al. patent (U.S. Patent No. 3,818,105) and the Merritt patent (U.S. Patent No. 3,634,265). Coopersmith teaches the use of isoparaffin as a skin lubricant. Merritt teaches the use of isoparaffin as a solvent. During the prosecution of the '179 patent, the Examiner cited as prior art the Deckner patent (U.S. Patent No. 4,481,186). Deckner teaches the use of *663 diethanolamine cetyl phosphate as an emulsifier in a cosmetic composition. In an Office Action dated November 13, 1989, the Examiner rejected Claims 1-10 under 35 U.S.C. ง 103 as being unpatentable over Coopersmith in view of Deckner.
91. On December 18, 1989, applicants' attorney conducted an interview with the Patent Examiner. At the interview, both the Deckner and Coopersmith patents were discussed.
92. On December 20, 1989, in response to the Office Action dated November 13, 1989, plaintiff argued that the citation to Coopersmith was inappropriate since it did not disclose alkyl phosphate salt, nor did it teach the use of isoparaffin as a thickener for lotion. In addition, plaintiff argued that the Deckner patent did not teach the use of isoparaffin nor the use of cetyl phosphate as a viscosity building agent. The Examiner considered plaintiff's arguments, withdrew the citation to Deckner and Coopersmith, and issued a Notice of Allowance.
93. Based upon the prosecution history and the testimony of Dr. Ghosh and Mr. Ziegler, co-inventors of the invention, and Professor Adelman, plaintiff's patent law expert and a professor of law at Wayne State University Law School, the Examiner's actions were completely proper and in accordance with acceptable practices before the U.S. Patent and Trademark Office.
94. Defendants' citation to other art, namely Canadian Patent X-XXX-XXX to Elliot, U.S. Letters Patent 4,355,046 to Suess, and U.S. Letters Patent No. 3,439,088 to Edman, are inapposite. None of these patents, read alone or in view of one another, teaches the combination of isoparaffin and DEA-cetyl phosphate to increase viscosity levels of aqueous cosmetic emulsions.
95. Claim 1 of the '179 patent reads as follows:
1. An aqueous cosmetic emulsion comprising:
i) an isoparaffin;
ii) a C8-C22 alkyl phosphate salt; wherein the isoparaffin and alkyl phosphate salt are present in a respective weight ratio of from about 40:1 to about 1:1, and said emulsion having a viscosity ranging from 35 to about 90 Brookfield units as measured with a Brookfield viscometer Model LVT using a # 4 spindle rotating at 60 rmp at 25 [degrees] C.
96. Mr. Ziegler, a person reasonably skilled in the art of creating cosmetic formulations, testified that an aqueous cosmetic emulsion refers to a water-based formulation which is stable and will not separate. Chesebrough considers a product to be stable when it does not break up after one year of shelf life.
97. The ratio of isoparaffin and alkyl phosphate salt set forth in Claim 1 specifically claims isoparaffin to alkyl phosphate salt in a relative ratio from about 40:1 to about 1:1. According to the testimony of Chesebrough's inventors, the ratio of about 40:1 to about 1:1 was claimed in the application because these ratios reflect the extent of the testing performed by the inventors at the time the utility patent application was filed.
98. According to the testimony of the inventors and Professor Adelman, the scope or range of the claims is controlled by the existence of prior art. There is no prior art which discloses the use of isoparaffin and DEA-cetyl phosphate to obtain a stable cosmetic emulsion with a viscosity range of 35 to about 90 Brookfield Units. The claimed ratio of "about 40:1 to about 1:1" is therefore elastic and is limited only by the prior art and the claims of the patent which teaches the use of isoparaffin and DEA-cetyl phosphate in combination to achieve a viscosity range of 35 to about 90 Brookfield Units.
99. There is nothing in the prosecution history or in the prior art which prevents Chesebrough from claiming that ratios of isoparaffin to alkyl phosphate salt greater than 40:1 infringe the '179 patent. Chesebrough may lawfully claim that lotions which contain isoparaffin and alkyl phosphate salt in ratios greater than 40:1 infringe the '179 patent as long as said emulsions are aqueous cosmetic emulsions which achieve viscosities of 35 to about 90 Brookfield Units.
*664 100. The Court appointed Professor James Stoffer, a Professor of Chemistry at the University of Missouri-Rolla, as an independent expert to assist the Court on the technical issues of patent validity and patent infringement. Professor Stoffer was qualified in emulsion technology and observed all of the trial testimony of the technical witnesses. Professor Stoffer issued a report on September 29, 1991, which fully supports Chesebrough's position that the '179 patent is valid and infringed by defendants' lotions containing isoparaffin and alkyl phosphate salt at weight ratios of 1:1 up to 162.9:1. Professor Stoffer concludes as follows: "Thus I can say that no substantial evidence was presented by the Defendant[s] to invalidate the patent or to support their claim that the 162:1 ratio was outside of the claims of the patent."
101. From December 16, 1989, up to the present, Chesebrough has placed its patent pending symbol on all of its packaging of VICL. This marking provided constructive notice to defendants that the marked goods are not in the public domain and may be subject to inchoate patent rights and future protection.
102. Defendants intentionally copied plaintiff's new formulation, especially its new ingredients, isoparaffin and DEA-cetyl phosphate salt, which are the subject of Chesebrough's '179 patent, in order to benefit from the fruits of plaintiff's efforts and creation.
103. Defendants continued to use isoparaffin and DEA-cetyl phosphate in their skin care lotion formulations after being sued for patent infringement on August 2, 1990.
104. Plaintiff's tests conducted on defendants' commercial formulation confirm that defendants' lotion, containing isoparaffin and DEA-cetyl phosphate in a relative ratio of 162.9:1, has a viscosity of 54.3, well within the range of 35 to about 90, as set forth in Claim 1 of the '179 patent.
105. From July 3, 1990, through April 1991, defendants made, used, and sold cosmetic emulsions containing isoparaffin and alkyl phosphate salt in ratios of 20:1, 40:1, and 162.9:1. All of these lotions fall within Claim 1 of the '179 patent.
106. Mr. Bowers testified that there are numerous ways to make bottle designs.
107. Chesebrough has many competitors in the skin care lotion market including Jergens, Nivea, Curel, and Keri. None of these competitors imitate or simulate the VICL bottle or the color combination used on the VICL bottle.
108. The U.S. Patent and Trademark Office has granted plaintiff U.S. Patent No. D318,037 for a bottle shape which is substantially identical to the revised VICL bottle.
109. Regarding the colors yellow, blue, and green, Mr. Bowers testified that there are numerous colors available for skin care lotion packaging. He also testified that when he decided to use this color combination, he knew that the VICL product was using these color combinations.
110. Ansehl produced numerous planning documents which discuss and track Ansehl's development of its revised skin care lotion packaging. None of these documents refers to defendants' assertion that the revised VICL bottle is functionally superior or that Ansehl copied the VICL bottle shape because of "functional" reasons.
111. For the six-month period of July 1989 to December 1989, plaintiff's sales for the revised VICL product exceeded $69,000,000. For the same period of time, Chesebrough's advertising and promotional efforts exceeded $35,000,000. The focus of the advertising and promotional efforts was the revised VICL trade dress (bottle and label design).
112. A tracking study conducted for Chesebrough in April 1990 shows that consumers use the VICL product two or three times a day. Therefore, consumers had ample opportunity to be exposed to the revised VICL packaging during the six-month period which preceded entry of the defendants' Venture skin care lotion.
113. The tracking study also shows that 97% of users of hand and body skin care lotions recognize the revised VICL trade dress. This figure exceeded the recognition *665 levels for other leading brands of skin care lotion, including Jergens, Curel, Nivea, and Keri.
114. Chesebrough commissioned a secondary meaning survey which was performed from May through July 1991, under the supervision and control of Dr. Jacob Jacoby, of SciRex, Inc. There were 550 persons interviewed throughout the country in nine geographic areas, including St. Louis, Missouri. The respondents were shown the new VICL bottle on which all textual material was obliterated, except for the ingredient list on the back and the bar code. The front of the bottle contained only the background blue, yellow, and green color scheme, without any other identifying materials. After viewing the bottle, the respondents were asked if they could identify the name of the lotion from looking at the bottle. The study was nondesigned and conducted according to the guidelines articulated in the Manual for Complex Litigation. See, Federal Judicial Center, Manual for Complex Litigation (5th ed. 1981) at page 116. Ninety-two percent of the respondents in St. Louis and 83% of the respondents throughout the country correctly identified the bottle as VICL.
115. Dr. Jacoby, plaintiff's expert and a professor of consumer psychology at New York University, testified that consumers only retain overall impressions of product appearances, including bottle shapes and colors. The average consumer purchasing inexpensive consumer goods, such as skin care lotions, usually reviews the product for approximately three seconds.
116. The overall appearance of the parties' products is substantially identical. The following are common features of the trade dress of the products in issue:
(1) The overall dimensions of the bottles (including the width and height of the face of the bottles), are within centimeters of each other;
(2) the shoulders of the bottles are rounded;
(3) the bottom areas of the bottles are tapered;
(4) the closures on the bottles are oval, flip-top caps;
(5) the bottles are colored the same shade of yellow;
(6) the labels are virtually the exact size and shape;
(7) the labels contain blue and green backgrounds with white lettering;
(8) the labels contain the phrases "FREE" and "33% MORE" in virtually the same size lettering and in exactly the same colors; and
(9) the only word trademarks appearing on the front labels of both bottles are Vaseline and Intensive Care.
117. At a trade show known as the Private Label Manufacturer's Association Conference ("PLMA"), Mr. Bowers showed a prototype of the Ansehl bottle to the trade. The prototype did not have any labels and was colored yellow. Mr. Bowers admitted that members of the trade told him that the prototype resembled the revised VICL bottle.
118. Mr. Gulledge corroborated Mr. Bowers' testimony. Mr. Gulledge was in attendance at the PLMA show and discussed the prototype with Mr. Bowers. Mr. Gulledge admitted that he wanted the prototype bottle for Venture's skin care lotion because it was similar to the revised VICL bottle.
119. Mr. Bowers admitted that the trade informed him that the Venture skin care lotion package, in its entirety, was similar in appearance to the revised VICL bottle.
120. Mr. Gulledge admitted that when he decided to use the comparison statement on the revised Venture bottle, he took into consideration the similarity between the Venture skin care lotion package and the revised VICL bottle.
121. Ansehl used its packaging, which mimicked the new VICL packaging, in sales presentations to obtain business.
122. Ansehl informed its customers that its new packaging "more closely resemble[s] the revised Intensive Care Lotion packaging" than the current packaging.
*666 123. The parties' products are competitive and are often sold in the same store.
124. Chesebrough presented evidence of actual confusion. Chesebrough identified a consumer, Mrs. Beverly Sickles, who mistakenly purchased a skin care lotion, manufactured by Ansehl for Target Drug Stores, believing that it was produced by the manufacturer of VICL. The packaging of the Target product is substantially identical to the Venture packaging and is produced by defendant Ansehl. Both the Target and Venture products are packaged in a yellow bottle shaped the same as the VICL bottle and bear a blue and green label.
125. Mrs. Sickles explained that she purchased the Target product because, based upon the similarity of the appearance of the Target and VICL packaging, she believed the product was produced by the manufacturer of the VICL product.
126. Mrs. Sickles specifically mentioned that the shape of the bottle, in addition to the label and bottle colors, led her to believe that the Target lotion was a Chesebrough product.
127. Contrary to the testimony of defendants, Mrs. Sickles testified she believed that national brands manufacturers often produce store name products. Thus, she reasonably believed that the Ansehl skin care lotion was produced by the manufacturer of VICL.
128. Mrs. Sickles also testified that she reviewed the ingredients on the back of the store brand product and compared them with the ingredients on the back of the VICL product. The fact that the ingredients were identical further confirmed in her mind that the manufacturer of VICL produced the store brand product.
129. Defendants' expert witness, Mr. Fred Edwards, agreed that Mrs. Sickles experienced actual confusion by mistakenly believing that the Ansehl product was made by the manufacturer of VICL.
130. The record is clear that defendants took a calculated business risk to copy and imitate the entire commercial impression of the VICL trade dress.
131. On March 23, 1990 Chesebrough's trial counsel gave defendants May and Venture specific written notice of Chesebrough's trademark/trade dress rights and claims of infringement. On May 2, 1990, May responded on behalf of itself and Venture, informing plaintiff that it would not cease its infringing activities. Thus, defendants willfully and knowingly infringed plaintiff's rights.
132. After being advised of Chesebrough's claims, Mr. Lynn Edwards, Ansehl's president, stated in a memorandum to Ansehl's Business Planning Group that Chesebrough was told to "stuff it".
133. Both parties' products are purchased by ordinary consumers. Thus, likelihood of confusion must be considered with the usual degree of consideration given by ordinary consumers in purchasing inexpensive items.
134. Defendants Ansehl and Venture removed the Venture name from the front label of the Venture skin care lotion product. Defendants offered no credible evidence in support of their contention that Venture lacks the right to use the name Venture on skin care lotion and related products. In fact, the record evidence shows that Venture has used its name on skin care and related products for several years.
135. Both Mr. Gulledge and Mr. Bowers admitted that the names VASELINE and INTENSIVE CARE are well-known to the public and they took this fact into consideration when they decided to use the statement "Compare to Vaseline Intensive Care." Both Mr. Gulledge and Mr. Bowers admitted that neither Ansehl nor Venture wanted to use the phrase "Compare to National Brand" even though this phrase has been used on other Venture products.
136. Both Mr. Gulledge and Mr. Bowers admitted that they wanted the comparison statement to be prominent.
137. The only word marks appearing upon the front of the Venture packaging are the words mark VASELINE and INTENSIVE CARE. The use of the marks VASELINE and INTENSIVE CARE in the *667 context of the entire Venture package enhances consumer confusion.
138. Defendants used the federally registered trademarks VASELINE and INTENSIVE CARE without permission from plaintiff.
139. The registration symbol is placed next to the VASELINE and INTENSIVE CARE marks on Venture's packaging because Mr. Bowers realized that the registration symbol is used by plaintiff on its VICL packaging. However, Mr. Bowers admitted that he was not instructed to use the registration symbol for the federally registered Venture square logo trademark which appears on the Venture package, even though Mr. Bowers testified that federal registration of trademarks is very important.
140. The disclaimer in small print on the bottom of the rear label of the Venture packaging is inadequate to prevent confusion. In fact, based upon the testimony of Dr. Jacoby, consumers rarely, if ever, pay attention to disclaimers, particularly ones which are obscured on the labeling.
141. Furthermore, Dr. Jacoby's research indicates that consumers often misread or do not comprehend disclaimers since consumers often focus upon the word or words with which they are most familiar. Here, a consumer is quite likely only to focus upon the names VASELINE and INTENSIVE CARE, the most well-known words in the disclaimer. Therefore, the disclaimer could actually foster confusion.
142. Defendant Ansehl supplied major retailers throughout the country with skin care lotion products containing isoparaffin and DEA-cetyl phosphate in ratios of 20:1, 40:1, and 162.9:1 with a viscosity range of about 50 to 70 Brookfield units. The lotion is sold in a trade dress which is substantially similar to the trade dress of the revised VICL bottle.
143. The period for patent infringement began on July 3, 1990 (issuance of the '179 patent) and continued through April 1991. The period for trademark and trade dress infringement began in January 1990 and continues to the present.
144. Ansehl has sold and continues to sell products packaged in infringing trade dress to the following: Venture, Target, A.A.R.P., Various, Big Star, Caldor, Woolworth, McCrory, K-Mart, Thrift Drug, Topco, Grand Union, and Walmart.
145. From July 3, 1990 to date, Ansehl has produced 325,000 gallons of skin care lotion containing isoparaffin and DEA-cetyl phosphate in a relative ratio of up to 162.9:1.
146. Ansehl bottles approximately 29% of its skin care lotion in 16-ounce bottles, and approximately 71% in 20-ounce bottles.
147. Ansehl has filled a total of 94,170 gallons of lotion containing isoparaffin and DEA-cetyl phosphate in a relative ratio of up to 162.9:1 into 16-ounce bottles from July 3, 1990, to date.
148. Ansehl has filled a total of 230,750 gallons of lotion containing isoparaffin and DEA-cetyl phosphate in a relative ratio of up to 162.9:1 into 20-ounce bottles from July 3, 1990, to date.
149. Ansehl has manufactured and sold 62,779 dozen 16-ounce bottles of skin care lotion containing isoparaffin and DEA-cetyl phosphate in a relative ratio of up to 162.9:1.
150. Ansehl has manufactured and sold 122,739 dozen 20-ounce bottles of skin care lotion containing isoparaffin and DEA-cetyl phosphate in a relative ratio of up to 162.9:1.
151. Chesebrough's gross profit per dozen bottles of VICL Lotion is $18.73.
152. Chesebrough's potential lost profit due to defendants' sales of skin care lotion containing isoparaffin and DEA-cetyl phosphate in a relative ratio of up to 162.9:1 in 16-ounce bottles equals $1,175,850.
153. Chesebrough's potential lost profit due to defendants' sales of skin care lotion containing isoparaffin and DEA-cetyl phosphate in a relative ratio of up to 162.9:1 in 20-ounce bottles equals $2,298,901.
154. Chesebrough's total patent damages based upon potential lost profits from the date the '179 patent issued (July 3, *668 1990) through production of all 162.9:1 products by Ansehl equals $3,474,751.
155. VICL is the only commercially available non-infringing skin care lotion product which contains isoparaffin and DEA-cetyl phosphate and which has the benefits afforded by the '179 patent. Anyone who desires to use isoparaffin and DEA-cetyl phosphate in a relative ratio of 162.9:1 and less in an aqueous cosmetic emulsion must obtain a license from Chesebrough.
156. Chesebrough had the manufacturing capacity to produce the 325,000 gallons of skin care lotion containing relative ratios of isoparaffin to DEA-cetyl phosphate of up to 162.9:1 which Ansehl produced and sold from July 3, 1990, to date.
157. Chesebrough has a 23% market share of the skin care lotion market.
158. Chesebrough clearly would have sold at least its market share (23%) of Ansehl's infringing sales from the date the '179 patent issued (July 3, 1990). This 23% share of Chesebrough's lost profits due to the infringing sales equals $799,193.
159. From July 3, 1990, to date, Ansehl sold a total of 185,518 dozen bottles of lotion containing isoparaffin and DEA-cetyl phosphate in a relative ratio of up to 162.9:1.
160. Ansehl's average selling price per dozen bottles is $10.63.
161. Ansehl's total sales of lotion containing isoparaffin and DEA-cetyl phosphate in a relative ratio of up to 162.9:1 equals $1,972,056.
162. Ansehl's profit margin on its sales of skin care lotion equals 30%.
163. From January 1990 through September 4, 1991, Ansehl sold 2,495 dozen bottles of its skin care lotion to Venture. Ansehl's profits from sales of its infringing product to Venture equal $8,599.
164. No other skin care lotion products on the market, other than VICL (and its store brand imitators), contain isoparaffin and DEA-cetyl phosphate.
165. Chesebrough has never licensed the '179 patent.
166. There is no established royalty in the industry.
167. Mr. Barry testified that Chesebrough would not have licensed the '179 patent even at a 50% royalty rate since Chesebrough would receive substantially less profits from such royalties as compared to the $3,474,751 in profits it might have made on sales of the same unit amount of product by Ansehl.
168. Defendants have submitted conflicting figures as to the number of bottles sold by Kessler to Ansehl. Defendants' Exhibit S-1 sets forth sales by Kessler to Ansehl of 897,284 units totalling $115,632.

Conclusions of Law
1. Chesebrough has alleged substantial claims for patent infringement under 35 U.S.C. ง 271, et seq., over which claims this Court has jurisdiction under 28 U.S.C. ง 1338(a).
2. Chesebrough has also alleged substantial claims for trademark and trade dress infringement, over which claims this Court has jurisdiction under 15 U.S.C. ง 1121 and 28 U.S.C. งง 1331 and 1338(a).
3. Chesebrough is the owner of the entire right, title, and interest in and to the Cheney, et al. patent, U.S. Patent No. 4,939,179 ("the '179 patent"), including all rights to recover damages for the infringement of said patent by defendants. 35 U.S.C. ง 284.
4. Chesebrough is the owner of the entire right, title, and interest in and to U.S. Trademark Registration Nos. 44,790 and 140,345 for the trademark VASELINE; and 864,662 for the trademark INTENSIVE CARE, including all rights to recover damages for the infringement of said trademarks by defendants. 15 U.S.C. ง 1117.
5. Chesebrough is the owner of the entire right, title, and interest in and to the trade dress (overall appearance and commercial impression of Chesebrough's revised VASELINE INTENSIVE CARE hand and body lotion package), including all rights to recover damages for the infringement *669 of said trade dress by defendants.
6. A patent owner's burden of proving patent infringement is proof by a preponderance of the evidence. Rite-Hite Corp. v. Kelley Co., Inc., 819 F.2d 1120, 1123 (Fed.Cir.1987); Hughes Aircraft Co. v. United States, 717 F.2d 1351, 1361 (Fed. Cir.1983); cf. SSIH Equipment S.A. v. United States Int'l Trade Comm'n, 718 F.2d 365, 376 (Fed.Cir.1983).
7. A trademark or trade dress owner's burden of proving the trademark or trade dress has been infringed is proof by a preponderance of the evidence. See David Sherman Corp. v. Heublein, Inc., 340 F.2d 377, 380-81 (8th Cir.1965).
8. A patent and each of its claims is presumed valid, and the burden of establishing invalidity rests on the party asserting such invalidity. 35 U.S.C. ง 282. This burden, which remains on the party asserting invalidity throughout and never shifts to the patent owner, is a heavy one requiring proof by clear and convincing evidence. Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc., 796 F.2d 443, 446 (Fed.Cir. 1986), cert. denied, 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987); Kimberly-Clark Corp. v. Johnson & Johnson, 745 F.2d 1437, 1443 (Fed.Cir.1984); Hughes Aircraft v. United States, 717 F.2d at 1359.
9. The Supreme Court recently has stated that the clear and convincing evidence standard requires the party having the burden to "place in the ultimate factfinder an abiding conviction that the truth of its factual contentions are `highly probable.'" Colorado v. New Mexico, 467 U.S. 310, 316, 104 S.Ct. 2433, 2437, 81 L.Ed.2d 247 (1984) (quoting) C. McCormick, Law of Evidence, ง 320, p. 679 (1954), reh'g denied, 468 U.S. 1224, 105 S.Ct. 19, 82 L.Ed.2d 915 (1984).
10. The presumption of validity is premised on the expertise possessed by the Patent and Trademark Office in interpreting technical references and having familiarity with the level of ordinary skill in the art. Bausch & Lomb, 796 F.2d at 447; American Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350, 1359 (Fed.Cir.), cert. denied, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).
11. This presumption of validity requires the Court to employ a decisional approach that starts with acceptance of the patent as valid, and then looks to the party asserting invalidity for clear and convincing proof of the contrary. 35 U.S.C. ง 282. An entire de novo evaluation of validity, as though the examining process of the Patent and Trademark Office had not occurred or is not entitled to substantial weight, would be improper. See Leinoff v. Louis Milona & Sons, Inc., 726 F.2d 734, 738 (Fed.Cir.1984).
12. The burden of establishing invalidity is also harder to carry when the prior art relied upon by the party attempting to prove invalidity is the same prior art or merely cumulative to that already considered by the Patent and Trademark Office in its examination of the patent. Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc., 796 F.2d at 447; Hughes Aircraft v. United States, 717 F.2d at 1359. In this case, defendants' defense of obviousness against the '179 patent is based on the same or cumulative prior art.
13. The party asserting a defense that the patent is unenforceable due to inequitable conduct before the Patent and Trademark Office also carries the heavy burden of proof by clear and convincing evidence. W.L. Gore & Assoc., Inc. v. Garlock, Inc., 721 F.2d 1540, 1558 (Fed.Cir. 1983), cert. denied, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984); Environmental Designs, Ltd. v. Union Oil Co. of Cal., 713 F.2d 693, 698 (Fed.Cir.1983), cert. denied, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984).
14. The proper interpretation of patent claims is fundamental to any evaluation of both the validity and infringement of a patent. The claims are the legal definition of the invention covered by the patent. See SRI Int'l v. Matsushita Electric Corp., 775 F.2d 1107, 1121 (Fed.Cir.1985). While there are certain statutory requirements that a patent must fulfill, it is the *670 claims in particular which are judged as valid or invalid over the prior art, and as infringed or not infringed by an accused device. Id.; Jackson Jordan, Inc. v. Plasser American Corp., 747 F.2d 1567, 1578 (Fed.Cir.1984). Each claim of a patent is a separate definition of the invention and is presumed valid independently of the validity of other claims. 35 U.S.C. ง 282.
15. In addition to the claims, the specification of a patent must include a written description and drawings of an exemplary embodiment and the best mode for carrying out the claimed invention known at the time of filing the application for the patent. 35 U.S.C. ง 112. The exemplary embodiment serves to illustrate only an example of what the claims are intended to cover, and the claims are not to be limited to exemplary embodiments or specific examples in the specification. SRI Int'l, 775 F.2d at 1121; Palumbo v. Don-Joy Co., 762 F.2d 969, 977 (Fed.Cir.1985); Fromson v. Advance Offset Plate, Inc., 720 F.2d 1565, 1568 (Fed.Cir.1983), aff'd in part, rev'd in part, 755 F.2d 1549 (Fed.Cir.1985); Quantum Corp. v. Mountain Computer, Inc., 5 U.S.P.Q.2d 1103, 1108, 1987 WL 45645 (N.D.Cal.1987).
16. Claim interpretation is a question of law. Perini America, Inc. v. Paper Converting Mach. Co., 832 F.2d 581, 584 (Fed.Cir.1987); Loctite Corp. v. Ultraseal Ltd., 781 F.2d 861, 866 (Fed.Cir. 1985). A claim is interpreted in light of the written description, drawings, the other claims of the patent and its prosecution history in the Patent and Trademark Office. Loctite, 781 F.2d at 867; McGill, Inc. v. John Zink Co., 736 F.2d 666, 673-75 (Fed.Cir.1984). The words of a claim are given their plain and ordinary meaning in the art, unless the patentee has chosen to give a word a special definition. Envirotech Corp. v. Al George, Inc., 730 F.2d 753, 759 (Fed.Cir.1984); see also Fromson v. Advance Offset, 720 F.2d at 1569.
17. Use of the word "about" in a claim is appropriate where the claim contains a range of components with no absolute boundaries. See Amgen, Inc. v. Chugai Pharmaceutical Co., 927 F.2d 1200, 1217-18 (Fed.Cir.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991). In Amgen, the Court of Appeals for the Federal Circuit stated that use of the word "about" in a claim is only limited to the extent that prior art exists, that is, prior art which would limit broad interpretation of the claim. Id. at 1218. In the present case, Claim 1 teaches that there is no exact or precise ratio of isoparaffin to DEA-cetyl phosphate which is necessary to obtain the teachings of the results of the patent. There was no prior art referred either during the prosecution of the patent or by the defendants, or by the Court's appointed expert, or by this Court which would limit Claim 1 of the '179 patent solely to aqueous cosmetic emulsions or skin care lotions which have a ratio of isoparaffin to DEA-cetyl phosphate of between 40:1 and 1:1.
18. Literal infringement is established if an accused product falls within the words of a claim of the patent. Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950).
19. As noted above, Claim 1 describes the invention as aqueous cosmetic emulsions containing isoparaffin and DEA-cetyl phosphate in ratios of about 40:1 to about 1:1 and having a viscosity ranging from 35 to about 90 Brookfield Units. There is nothing in the prior art or the file history of the '179 patent which would impose a strict limitation on the interpretation of the word "about." See Amgen v. Chugai Pharmaceutical, 927 F.2d at 1218. To impose a strict limitation on Claim 1 would be to improperly use an exemplary embodiment, namely, ratios of 40:1, rather than the claim itself which uses the word "about" as the metes and bounds of the invention. SRI Int'l v. Matsushita Electric, 775 F.2d at 1121; Palumbo v. Don-Joy, 762 F.2d at 977; Fromson v. Advance Offset, 720 F.2d at 1568; Quantum Corp. v. Mountain Computer, 5 U.S.P.Q.2d at 1108 (N.D.Cal.1987). Indeed, testimony of the inventors shows that they were unsure as to the exact metes and bounds of the *671 invention and thus used the word "about" to show that the teachings of the invention could be obtained by using other ratios. Prior to this litigation, the inventors themselves had only tested lotions containing isoparaffin and DEA-cetyl phosphate in ratios up to but not exceeding 40:1.
20. In order literally to infringe Claim 1, defendants must make, use, or sell a skin care formulation which is an "aqueous cosmetic emulsion." 35 U.S.C. ง 271(a). Testimony from the inventors indicates that an emulsion is a mixture which is stable and will not readily break up.
21. Based upon the testimony, the Court finds that defendants' skin care lotion products having ratios of isoparaffin to DEA-cetyl phosphate of 162.9:1, 40:1, and 20:1 literally infringe Claims 1-10 of the '179 patent. Accordingly, plaintiff is entitled to damages starting from July 3, 1990, the date of the issuance of the patent. See 35 U.S.C. ง 284.
22. The Doctrine of Equivalents exists for the equitable purpose of preventing an infringer from stealing the benefit of an invention. Under the Doctrine of Equivalents, an accused formulation that does not literally include every element of a claim may be found to infringe if it performs substantially the same function in substantially the same way to obtain substantially the same result as the claimed invention. Graver Tank v. Linde Air, 339 U.S. at 608-10, 70 S.Ct. at 856-57; Hughes Aircraft v. United States, 717 F.2d at 1361; Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 934 (Fed.Cir. 1987), cert. denied, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). Equivalence is an issue of fact. Graver Tank v. Linde Air, 339 U.S. at 609, 70 S.Ct. at 856; D.M.I., Inc. v. Deere & Co., 755 F.2d 1570, 1575 (Fed.Cir.1985).
23. Defendants have duplicated the most important attributes of Chesebrough's VICL product. Defendants use the isoparaffin and DEA-cetyl phosphate ingredients in a ratio which produces viscosity within the range of 35 to about 90 Brookfield Units set forth in Claim 1 of the '179 patent.
24. Defendants' use of isoparaffin and DEA-cetyl phosphate in a relative ratio of 162.9:1 performs substantially the same function (enhancement of viscosity despite reduction of mineral oil content), in substantially the same manner (a remarkable viscosity increase due to the unique interaction of isoparaffin with DEA-cetyl phosphate), to obtain substantially the same results (a low mineral oil skin care lotion which has the viscosity claimed in the '179 patent without a greasy, heavy feel). Graver Tank, 339 U.S. at 608-10, 70 S.Ct. at 855-57.
25. The Court finds that defendants' skin care lotion product, at a ratio of 162.9:1, is the equivalent of plaintiff's '179 patent. Mr. Benkendorf, Ansehl's chemist who was instructed to match plaintiff's formula, admitted that the lotion in ratios of 162.9:1 has substantially similar properties to Chesebrough's lotion. The analysis of defendants' skin care lotion product which contains isoparaffin and DEA-cetyl phosphate at a relative ratio of 162.9:1 conducted by Mr. Ziegler confirmed Mr. Benkendorf's statement. Defendants' analysis of defendants' lotion with a ratio of 162.9:1 confirmed that defendants' lotion is an aqueous cosmetic emulsion containing isoparaffin and DEA-cetyl phosphate with a viscosity of 57 Brookfield Units, clearly within Claim 1 of the '179 patent. At the same time, defendants have successfully been able to minimize the amount of mineral oil in the formulations, thereby achieving the desirable effect of a less greasy stable product, which was the objective of the '179 patent.
In his findings filed with the Court on October 4, 1991, Professor Stoffer stated:
The Defendant[s'] charge that the 162:1 formulation was outside of the patent claim was addressed by Defendant[s'] witness Mr. Beckendorf on Sept. 25, 1991. He went into a lengthy testimony as to why the 162:1 was outside the patent's claims. He referred to Defendant[s'] exhibit A-7 and to a specific formulation manufactured on 4/9/91. *672 He went to great lengths to compare viscosities for several formulations manufactured for test purposes. There was one used as a standard with all ingredients, one without DEA, one without isoparaffin, one without either DEA or isoparaffin. He compared the viscosities etc. for these systems and testified that since there was no viscosity change in this set of formulations, that the iso to DEA ratio of 162:1 was outside of the patent claims. I had problems with this testimony. I went back and checked the records shown in Defendant[s'] exhibit A-7 and found that the iso to DEA ratio was 20,000 Gms. 20,000 divided by 0.008 equals 2500 not 162. Thus this set of data is for a formulation of 2500:1 which is very close to the 2600:1 ratio which the Plaintiff already admits is outside the claims of the patent. Thus I can say that no substantial evidence was presented by the Defendant[s] to invalidate the patent or to support their claim that the 162:1 ratio was outside of the claims of the patent.
(emphasis in original).
26. Defendants' ratio of isoparaffin to DEA-cetyl phosphate, which performs substantially the same function, in substantially the same manner, to obtain substantially the same results, infringes Claim 1 of the '179 patent under the Doctrine of Equivalents.
27. A patent can be held invalid under 35 U.S.C. ง 103 only if there is clear and convincing proof that the differences between the claimed subject matter and the prior art are such that the claimed subject matter as a whole would have been obvious at the time the invention was made, to a person of ordinary skill in the art to which the invention pertains.
28. Obviousness is a conclusion of law based upon fact determinations. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). Those fact determinations require determining (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the art to which the invention pertains, and (4) additional evidence which may serve as indicia of nonobviousness. Id. Such additional evidence may include the invention's satisfaction of previously recognized and unsolved needs, acceptance and copying of the invention by those concerned with the subject matter, commercial success, and failure of others to solve the problems which the invention remedied. Id. at 17-18, 86 S.Ct. at 693-94. Against this background, the obviousness or nonobviousness of the subject matter of the '179 patent must be determined. Id.; Environmental Designs v. Union Oil, 713 F.2d at 695; Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1566 (Fed.Cir.), cert. denied, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987).
29. Obviousness is judged by whether or not the invention as a whole would have been obvious to a person of ordinary skill in the art at the time of the invention โ not to the judge, or to a layman, or to those skilled in remote arts, or to geniuses in the art at hand. Custom Accessories, Inc. v. Jeffrey-Allan Indus., 807 F.2d 955, 962 (Fed.Cir.1986). "The person of ordinary skill is a hypothetical person who is presumed to be aware of all the pertinent prior art. The actual inventor's skill is not determinative." Id. Accordingly, the prior art references relied upon by defendants are to be read and understood from the viewpoint of a person of ordinary skill in the art, without reading into that art the teachings of the patented invention. Id. at 962-63; Environmental Designs, 713 F.2d at 697; Leinoff v. Louis Milona, 726 F.2d at 739.
30. Factors that may be considered in determining the level of ordinary skill in the art include:
(1) the educational level of the inventor;
(2) the type of problems encountered in the art;
(3) prior art solutions to those problems;
(4) the rapidity with which innovations are made;
(5) the sophistication of the technology; and

*673 (6) the educational level of active workers in the field.
Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case. The important consideration lies in the need to adhere to the statute, i.e., to hold that an invention would or would not have been obvious, as a whole, when it was made, to a person of "ordinary skill in the art." Environmental Designs v. Union Oil, 713 F.2d at 696-97.
31. In determining obviousness or nonobviousness of the patent, defendants' use of hindsight to select isolated elements from the prior art and combine them in the way discovered by plaintiff, is improper. Orthopedic Equipment Co. v. United States, 702 F.2d 1005, 1012 (Fed. Cir.1983). A prior art reference is to be considered as a whole, and portions against or teaching away from the claimed invention must also be considered. Bausch & Lomb v. Barnes-Hind/Hydrocurve, 796 F.2d at 448. Moreover, obviousness cannot be established by combining the teachings of prior art to produce the claimed invention absent some teaching, suggestion or incentive supporting the combination. Carella v. Starlight Archery and Pro Line Co., 804 F.2d 135, 140 (Fed.Cir.1986).
32. It would not have been obvious to combine the prior art references relied upon by defendants for a number of reasons. First and foremost among these reasons is that there is simply nothing in those references suggesting that their teachings could be successfully combined to yield advantageous results in the '179 patent. In re Sernaker, 702 F.2d 989, 995-96 (Fed.Cir.1983); ACS Hosp. Sys., Inc. v. Montefiore Hosp., 732 F.2d 1572, 1577 (Fed.Cir.1984). The test under 35 U.S.C. ง 103 is not what "one might contemplate" doing based on the prior art references. Medtronic, Inc. v. Cardiac Pacemakers, Inc., 721 F.2d 1563, 1581-82 (Fed.Cir.1983).
33. Further, in determining the obviousness or nonobviousness of an invention, the test is not whether it would have been "obvious to try" the specific combination of steps or elements that led to plaintiff's claimed subject matter. This so-called "obvious to try" approach has been consistently rejected as a test of obviousness. Jones v. Hardy, 727 F.2d 1524, 1530 (Fed.Cir.1984); In re Geiger, 815 F.2d 686, 688 (Fed.Cir.1987); In re Yates, 663 F.2d 1054, 1057 (C.C.P.A.1961); In re Goodwin, 576 F.2d 375, 377 (C.C.P.A.1978), aff'd, 599 F.2d 1060 (C.C.P.A.1979).
34. Defendants' failure to present any evidence that anyone in this country prior to June 1989 (the filing date of the application for the '179 patent) ever used isoparaffin in combination with DEA-cetyl phosphate to obtain increased viscosity without the greasiness of mineral oil means that defendants' obviousness attack against plaintiff's invention must fail. Fromson v. Advance Offset, 720 F.2d at 1556; see also Bausch & Lomb v. Barnes-Hind/Hydrocurve, 796 F.2d at 448; Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1575 (Fed.Cir.1986); In re Piasecki, 745 F.2d 1468, 1474 (Fed.Cir.1984). The Federal Circuit has aptly applied the adjective "bizarre" to the argument that the claimed subject matter of a patent was merely an "obvious extension" of known technology when no one skilled in the art attempted such "extension" even though the economic advantages of the known technology were publicly available. Fromson, 720 F.2d at 1557. The Court further pointed out that it was "not insignificant" that the witness who claimed to have been "aware of" the prior art at the time of the invention of the patent in dispute never developed or even experimented with the claimed subject matter. Id. at 1557-58; see also Rosemount, Inc. v. Beckman Instruments, Inc., 727 F.2d 1540, 1546 (Fed. Cir.1984); Panduit v. Dennison Mfg., 810 F.2d at 1571; State Indus., Inc. v. Mor-Flo Indus., Inc., 639 F.Supp. 937, 945 (E.D.Tenn.1986).
35. The widespread consumer acceptance and resulting commercial success of the invention claimed in the '179 patent, and its displacement of the prior skin care lotion which contained greater amounts of mineral oil and less glycerine, serves as additional evidence and buttresses a conclusion *674 of nonobviousness. Austin v. Marco Dental Prods., Inc., 560 F.2d 966, 972 (9th Cir.1977), cert. denied, 435 U.S. 918, 98 S.Ct. 1477, 55 L.Ed.2d 511 (1978); Smith v. Goodyear Dental Vulcanite Co., 93 U.S. 486, 23 L.Ed. 952 (1876).
36. Defendants have failed to prove clearly and convincingly, in the face of the examination and confirmation of plaintiff's patent by the U.S. Patent and Trademark Office, that the differences between the invention defined by the claims in suit of the '179 patent and the prior art are such that the invention claimed would have been obvious in 1989 to a person of ordinary skill in the art.
37. The requirement of patent applicants and their counsel to maintain a duty of candor to the U.S. Patent and Trademark Office during prosecution of a patent application has its basis in 37 C.F.R. ง 1.56(a). This rule states that those who practice before the Patent and Trademark Office have a duty to "disclose to the Office information they are aware of which is material to the examination of the application." Id. Known information is material "where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." Id. It is clear, however, that an applicant for a patent is under no obligation to disclose all "pertinent" prior art or other "pertinent" information of which he is aware as that ignores the requirement of materiality. American Hoist v. Sowa, 725 F.2d at 1362.
38. In determining whether conduct during prosecution of a patent application renders the resulting patent unenforceable, the materiality of the omission or misrepresentation is balanced against the level of intent with which the action or lack thereof was taken. Id. at 1363. Where it is demonstrated that a reasonable examiner would merely have considered particular information to be important but not crucial to his decision not to reject, a showing of facts which would indicate something more than gross negligence or recklessness is generally required to justify holding the patent invalid or unenforceable, and good faith judgment or honest mistake may be a sufficient defense. Id.
39. Defendants are unable to prove any material impropriety in plaintiff's disclosure of relevant prior art (which includes the Coopersmith and Merritt patents) during the prosecution of the original application.
40. Nor can defendants establish any improprieties in the arguments for patentability plaintiff presented to the Patent Examiner. The mere fact that a patent application attempted to distinguish the claimed invention from the prior art does not constitute a material omission or misrepresentation. The Examiner is always free to reach his or her own conclusions regarding the claimed invention based upon the art in front of him or her. Akzo N.V. v. U.S. Int'l Trade Comm'n, 808 F.2d 1471, 1482 (Fed.Cir.1986), cert. denied, 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987).
41. The degree of materiality and intent from these events, taken separately or together, are totally insufficient to support a legal conclusion of inequitable conduct. State Indus. v. Mor-Flo Indus., 639 F.Supp. 937; Kimberly-Clark Corp. v. Johnson & Johnson, 745 F.2d 1437, 1454-53 (Fed.Cir.1984).
42. Under Title 35 of the United States Code, plaintiff is entitled to recover from defendants its damages adequate to compensate plaintiff for defendants' infringement of the '179 patent. 35 U.S.C. ง 284; Del Mar Avionics, Inc. v. Quinton Instrument Co., 836 F.2d 1320, 1326 (Fed. Cir.1987); see also Hartness Int'l, Inc. v. Simplimatic Eng'g Co., 819 F.2d 1100, 1112 (Fed.Cir.1987).
43. The plaintiff is to be restored financially to the position it would have been in but for the infringement. Del Mar Avionics v. Quinton Instrument, 836 F.2d at 1320. In the present case, plaintiff seeks patent damages in an amount equal to its lost profits due to defendants' infringing sales.
44. Defendants were provided notice of plaintiff's pending patent as of December *675 16, 1989, when plaintiff first placed the words "patent pending" on the back of its skin care lotion bottles. This marking serves to notify defendants that the marked articles are not in the public domain and may be subject to inchoate patent rights and future protection. 1 P. Rosenberg, Patent Law Fundamentals, ง 2.09 at 2-18-4 (1991).
45. When the amount of damages cannot be ascertained with precision, any doubts regarding the amount must be resolved against the infringer. Doubts regarding the amount of damages also rest on the infringer when the inability to ascertain plaintiff's damage is due to the infringer's failure to keep accurate or complete records. Beckman Instruments, Inc. v. LKB Produkter AB, 703 F.Supp. 408 (D.Md.1988), aff'd in part, vacated in part, 892 F.2d 1547 (Fed.Cir.1989).
46. Plaintiff asserts it is entitled to recover as a measure of damages its lost profits caused by defendants' infringement of the '179 patent. King Instrument Corp. v. Otari Corp., 767 F.2d 853, 863 (Fed.Cir.1985), cert. denied, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986). See also Bic Leisure Prods. v. Windsurfing Int'l, Inc., 761 F.Supp. 1032, modified, 774 F.Supp. 832 (S.D.N.Y.1991).
47. Plaintiff bears the burden of proving lost profits by a reasonable probability. King Instruments v. Otari, 767 F.2d at 863. That is, that but for the defendants' infringing sales of skin care lotion containing isoparaffin and DEA-cetyl phosphate in a relative ratio of up to 162.9:1, plaintiff would have made those sales. Id.
48. The proper measure of damages is the profits lost by the patentee as a result of the infringement. See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1156 (6th Cir.1978); Bic Leisure v. Windsurfing Int'l., 761 F.Supp. at 1033.
49. The guidelines set forth in Panduit generally provide that to obtain lost profits, the patent owner must prove: (1) a demand for the patented product during the period of infringing sales; (2) an absence of acceptable noninfringing substitutes; (3) the patent owner had the ability to meet the demand for the product covered by the patent; and (4) the amount of profit the patent owner would have made.
50. The Court finds that the demand for the VICL product among consumers during the period of infringement has been and continues to be high. The Court finds further that plaintiff had and continues to have the capability to manufacture and market the VICL product to meet consumer demand filled by defendants' infringing product. Bic Leisure v. Windsurfing Int'l, 761 F.Supp. at 1037-38.
51. However, the Court finds that plaintiff cannot prove the second or fourth parts of the Panduit formulation. Plaintiff asserts that there is a reasonable probability that it would have made the sales made by defendants. Plaintiff has submitted evidence that its lost profit due to defendants' infringing sales equals $3,474,751. The Court rejects plaintiff's assertion that, but for defendants' infringing sales, plaintiff would have made that total number of sales. Plaintiff's assertion assumes that, absent the Venture skin care lotion product, each and every purchaser of the Venture product would have purchased the VICL product. While plaintiff is not required to prove causation as a certainty or to negate all possibilities that a purchaser might purchase a different product, or might have foregone the purchase altogether, plaintiff must show with a reasonable probability that it would have made the infringing sales made by defendants. King Instruments v. Otari, 767 F.2d 853, 864 (Fed.Cir.1985).
52. In the alternative and assuming there are noninfringing substitutes for the VICL product, plaintiff is entitled to at least 23% (which represents its market share in the skin and body lotion market) of the number of unit sales of VICL made by defendants times the plaintiff's margin for the VICL product. Uniroyal, Inc. v. Rudkin-Wiley Corp., 939 F.2d 1540, 1545-46 *676 (Fed.Cir.1991); BIC Leisure Products, 761 F.Supp. at 1036.
53. Generally, the Court would find that plaintiff was entitled to damages in the amount of a reasonable royalty for the use made of the invention by the infringer, together with interest and costs a fixed by the Court. 35 U.S.C. ง 284.
54. A reasonable royalty is the amount of money which the owner of a patent would accept to license his patent and the amount a person would be willing to pay for the license. State Industries v. Mor-Flo, 883 F.2d at 1580. However, the setting of a reasonable royalty after infringement cannot be treated as the equivalent of ordinary royalty negotiations among truly willing patent owners and licensees. Moxness Prods., Inc. v. Xomed, Inc., 8 U.S.P.Q.2d 1281, 1294 (M.D.Fla.1988), aff'd in part, rev'd in part, 891 F.2d 890, 13 U.S.P.Q.2d 1169 (Fed.Cir.1989); Beckman v. LKB, 703 F.Supp. 408.
55. In the present case, the Court notes the absence of an established royalty in the industry and cannot speculate as to what the parties would have willingly agreed to if license negotiations had taken place prior to the infringement. The Court finds that an amount of damages based on plaintiff's established market share is appropriate in this case. Based on the facts set forth in plaintiff's Exhibit 636 and the supplement thereto, as well as other exhibits filed herein, and the testimony by plaintiff's damage expert, Mr. Donald Barry, plaintiff's 23% market share of defendants' infringing sales equals $799,193.
56. In addition to the recovery of compensatory damages, plaintiff is entitled to an award of prejudgment interest, increased damages (up to three times actual damages), and reasonable attorney's fees. 35 U.S.C. งง 284, 285.
57. Plaintiff is entitled to prejudgment interest from the date of infringement to the date of judgment. Nickson Indus., Inc. v. Rol Mfg. Co., 847 F.2d 795, 800 (Fed.Cir.1988). An appropriate and convenient rate to use for prejudgment interest is the prime rate. Gorenstein Enter. v. Quality Care, 874 F.2d 431, 437 (7th Cir.1989). The Court will apply the prime rate in this case at the established rate at the time of infringement. The Court notes that on July 3, 1990, the prime rate was 10%.
58. Plaintiff is entitled to recover reasonable attorney's fees under 35 U.S.C. ง 285. Attorney's fees are granted where defendants have willfully infringed. Ryco, Inc. v. Ag-Bag Corp., 857 F.2d 1418, 1429 (Fed.Cir.1988); Del Mar Avionics v. Quinton Instrument, 836 F.2d at 1329; Spindelfabrik Suessen-Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik AG, 829 F.2d 1075, 1085 (Fed. Cir.1987) cert. denied, 484 U.S. 1063, 108 S.Ct. 1022, 98 L.Ed.2d 987 (1988); Bott v. Four Star Corp., 807 F.2d 1567, 1574 (Fed. Cir.1986). Under the circumstances of this case, defendants specifically acted to match plaintiff's lotion and continued willfully to infringe after the lawsuit was filed on August 2, 1990. Accordingly, this Court finds that plaintiff is entitled to treble damages in the amount of $2,397,579, attorney's fees, and costs, as well as prejudgment interest at the above-noted rate from the date of infringement to the date of judgment.
59. The patent statute empowers the Court to "grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the Court deems reasonable." 35 U.S.C. ง 283. Plaintiff is entitled to an injunction under 35 U.S.C. ง 283 enjoining defendants from making, using, or selling a skin care lotion containing isoparaffin and DEA-cetyl phosphate in a relative ratio of up to 162.9:1.
60. In an action for trade dress infringement, plaintiff must establish three elements: (1) that the trade dress is nonfunctional; (2) that the trade dress has acquired secondary meaning or consumer recognition; and (3) that the defendants' use of a similar trade dress is likely to cause confusion as to the source of the products sold by defendant. Truck Equipment Service Co. v. Fruehauf Corp., 536 F.2d 1210, 1217-20 (8th Cir.), cert. denied, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976).
*677 61. A product's trade dress is non-functional if competitors can compete effectively without copying the plaintiff's trade dress. In re Morton-Norwich Prods., Inc., 671 F.2d 1332, 1337 (C.C.P.A. 1982); Truck Equipment, 536 F.2d at 1217-18; Contour Chair Lounge Co. v. True-Fit Chair, Inc., 648 F.Supp. 704 (E.D.Mo.1986). There is no legitimate competitive need to sell skin care lotion in a container having the precise shape and appearance of the VICL packaging.
62. Defendants assert that plaintiff's relaunched VICL container is functional and said functionality is an important ingredient in its commercial success. The Court notes that while there is some evidence that plaintiff considered certain functional aspects of its relaunched container, said functionality does not rise to a level so as to permit its imitation in the interest of free competition. Truck Equipment, 536 F.2d at 1217, 1218. Plaintiff submitted evidence of numerous competitors in the skin care lotion market who effectively compete in the market using substantially different shaped bottles. The Court finds that the relaunched VICL bottle was primarily adopted for purposes of identification and individuality. Id.
63. In addition, the U.S. Patent and Trademark Office has granted to Chesebrough a design patent (U.S. Patent No. D318,037) on the defendants' revised bottle, which is substantially similar to the revised VICL bottle. The fact that Chesebrough owns this design patent raises a presumption that the revised VICL bottle design is not functional. In re Morton-Norwich Prods., 671 F.2d at 1342 n. 3.
64. Intentional copying of a product's trade dress raises an inference that secondary meaning exists. Midway Mfg. Co. v. Dirkschneider, 543 F.Supp. 466, 486 (D.Neb.1981). As noted in Midway, the only reasonable motivation for such conscious imitation would be to take advantage of the secondary meaning associated with the design. Id. There is overwhelming evidence in this case that defendants deliberately copied plaintiff's trade dress for financial gain. Thus, there exists a strong inference that the revised VICL packaging acquired secondary meaning before defendants infringed. Id. at 486; Truck Equipment Serv. Co. v. Fruehauf Corp., 536 F.2d 1210 (8th Cir.1976); OSEM Food Industries v. Sherwood Foods, Inc., 917 F.2d 161 (4th Cir.1990).
65. Before defendants entered the market with the accused packaging, plaintiff had sold over $69,000,000 of VICL in the revised packaging and had spent $35,000,000 in advertising and promotional expenses. These figures indicate that the trade dress had widespread secondary meaning before defendants began their infringing acts. See 1 J. McCarthy, Trademarks and Unfair Competition, ง 15:20 at 701-02 (2d ed. 1984).
66. There is also substantial evidence that purchasers of plaintiff's VICL use the product at least three or four times a day. Under these circumstances, consumers had extensive exposure to the revised VICL package before defendants' infringement. The evidence of secondary meaning is further buttressed by the 1990 tracking study performed by Chesebrough which showed that 97% of the respondents recognized the revised VICL bottle.
67. The results of this tracking study are overwhelmingly supported by Dr. Jacoby's secondary meaning study. Dr. Jacoby showed that 83% of the consumers nationwide (92% in the St. Louis area) who were shown the revised VICL trade dress, without the VASELINE and INTENSIVE CARE trademarks or any other textual materials, recognized the packaging as VICL. Generally, figures over 50% are regarded as clearly sufficient evidence of secondary meaning. 2 J. McCarthy, ง 32:54 at 786. This Court awards substantial weight to properly conducted surveys. Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc., 758 F.Supp. 512, 524 (E.D.Mo.1991).
68. Accordingly, the Court finds that the revised trade dress had secondary meaning at the time defendants began their infringing activities in January 1990, and that the revised VICL trade dress continued to have secondary meaning after the infringement occurred.
*678 69. The same Squirtco factors used to determine trademark infringement are applicable in trade dress infringement cases under Section 43(a) of the Lanham Act. Contour Chair v. True-Fit, 648 F.Supp. at 713-14.
70. In order to determine whether a likelihood of confusion exists between the trade dress of two products, the following factors must be examined: (1) the strength of the plaintiff's mark; (2) similarity of the marks; (3) similarity of the products; (4) the competitive proximity of the products; (5) the defendants' intent; and (6) instances of actual confusion. Squirtco v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir.1980).
71. The evidence presented by Chesebrough regarding secondary meaning proves that the VICL trade dress is a "strong mark." See Charles of the Ritz Group, Ltd. v. Quality King Distrib., Inc., 832 F.2d 1317 (2d Cir.1987). Strong marks are entitled to a wide scope of protection. Squirtco, 628 F.2d at 1091.
72. The parties' respective trade dress must be compared as they would be viewed by an ordinary, non-discerning purchaser. Chesebrough Mfg. Co. v. Old Gold Chem. Co., 70 F.2d 383, 384 (6th Cir.), cert. denied, 293 U.S. 599, 55 S.Ct. 116, 79 L.Ed. 691 (1934); 2 J. McCarthy, ง 23:27.
73. The Court concludes that the trade dress of VICL packaging and the Venture packaging are extremely similar.
74. Where the trade dress at issue is for inexpensive products, the risk of confusion is increased. Midway v. Dirkschneider, 543 F.Supp. 466. This is because consumers take less care in shopping for and selecting inexpensive products. Id. See also Sun-fun Products, Inc. v. Suntan Research & Dev., Inc., 656 F.2d 186, 191-92 (5th Cir.1981) (suntan lotions are inexpensive and bought casually); Beer Nuts, Inc. v. Clover Club Foods Co., 805 F.2d 920, 926-27 (10th Cir.1986); Playboy Enter. Inc. v. Chuckleberry Publishing, Inc., 486 F.Supp. 414, 427 (S.D.N.Y.1980).
75. Where the plaintiff's and defendants' products are closely related, less similarity is necessary to support a finding of infringement. Squirtco, 628 F.2d 1086.
76. The Court concludes that the parties' products are directly competitive.
77. Proof of intentional copying permits the Court to infer that there is a likelihood of confusion. Gilbert/Robinson v. Carrie Beverage, 758 F.Supp. 512; Truck Equipment, 536 F.2d 1210. There is overwhelming evidence that defendants acted with deliberate intent to imitate and infringe the revised VICL trade dress. There is a strong inference of likelihood of confusion in this case.
78. Actual confusion is not required in order to prove trade dress infringement, but once shown, it is positive proof of likelihood of confusion. Squirtco, 628 F.2d at 1091. See also Varitronics Svs., Inc. v. Merlin Equip., Inc., 682 F.Supp. 1203, 1208-09 (S.D.Fla.1988) (while there is only one incident of actual confusion, "it is a very compelling incident" and substantiates a finding of likelihood of confusion); Molenaar, Inc. v. Happy Toys, Inc., 188 U.S.P.Q. 469 (T.T.A.B.1975) (single instance of confusion is at least "illustrative of how and why confusion is likely"); Roto-Rooter Corp. v. O'Neal, 513 F.2d 44, 46 (5th Cir.1975) (very little proof of actual confusion is necessary to prove likelihood of confusion); Ambrit, Inc. v. Kraft, Inc., 812 F.2d 1531 (11th Cir.1986), cert. denied, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987) ("it takes very little evidence to establish the existence of the actual confusion factor"); Waples-Platter Cos. v. Gen. Foods Corp., 439 F.Supp. 551, 582 (N.D.Tex.1977) (any proof of actual confusion is significant); World Carpets, Inc. v. Dick Littrell's New World Carpets, 438 F.2d 482, 489 (5th Cir.1971) (while "very little" proof of actual confusion is necessary to establish a likelihood of confusion, "an almost overwhelming amount of proof would be necessary to refute such proof").
79. The testimony of a purchaser who is actually confused as to the source of defendants' product is highly probative of a likelihood of confusion. 2 J. McCarthy, *679 ง 23:2 at 51-52. Thus, this factor weighs strongly in favor of finding trademark infringement. See Gilbert/Robertson v. Carrie Beverage, 758 F.Supp. at 524.
80. In addition to the above evidence of actual confusion presented by Chesebrough, actual confusion may be presumed in this case. Plaintiff has demonstrated by overwhelming evidence that defendants intended to deceive and confuse the public in connection with the Venture skin care lotion product. Under such circumstances, a presumption arises that actual confusion has occurred. My-T-Fine Corp. v. Samuels, 69 F.2d 76, 77 (2d Cir. 1934); see also Getty Petroleum Corp. v. Island Transp. Corp., 878 F.2d 650, 655-56 (2d Cir.1989); PPX Enter. v. Audiofidelity Enter., 818 F.2d 266, 272 (2d Cir.1987); U-Haul Int'l, Inc. v. Jartran, Inc., 601 F.Supp. 1140, 1149 (D.Ariz.1984); 2 J. McCarthy, ง 30:25 at 500.
81. The determination of whether likelihood of confusion exists is a question of fact. Squirtco, 628 F.2d 1086.
82. Based upon the Squirtco factors, the Court finds that there is a likelihood of confusion between defendants' trade dress and the revised VICL trade dress.
83. The Court further finds that defendants' infringement of plaintiff's trade dress was willful and done in careless disregard of plaintiff's rights. Defendants took a calculated business risk in January 1989 to copy plaintiff's trade dress. Further, this decision was compounded by defendants' disregard of plaintiff's March 23, 1990, cease and desist letter.
84. Finally, the evidence clearly shows that defendants intended to market and sell a modified bonus version of their skin care lotion in order to take advantage of the promotion and sales of plaintiff's revised bonus product. Accordingly, defendants produced and sold a 20-ounce bonus product in January 1990 and continued to sell the same bonus product until May 1991.
85. Courts permit and have awarded damages for both patent and trademark infringement in a single case where two independent and separate legal wrongs have been committed. Where the plaintiff proves liability under both the Patent Act and the Trademark Act, it is entitled to the damages caused by each wrong. Sun Prods. Group, Inc. v. B & E Sales Co., Inc., 700 F.Supp. 366, 386 (E.D.Mich. 1988); Joy Mfg. Co. v. CGM Valve & Gauge, 730 F.Supp. 1387, 1400 (S.D.Tex. 1989).
86. Under the U.S. Trademark Act, plaintiff is entitled to injunctive relief against any further use of plaintiff's trademarks and any similar packaging (15 U.S.C. ง 1116), an accounting of all the profits earned by defendants on the infringing merchandise, an award of actual damages as proven by plaintiff (15 U.S.C. ง 1117), the costs of the action (15 U.S.C. ง 1117; Rule 54(d), Fed.R.Civ.P.), and an order to destroy all labels, signs, packaging, plates, molds, and other means of making the infringing merchandise (15 U.S.C. ง 1118).
87. In assessing damages, the Court has discretion to increase the amount found as actual damages up to three times such amount. In addition, the Court has discretion to enhance the amount of recovery based on profits. 15 U.S.C. ง 1117.
88. In exceptional cases, the Court may award reasonable attorney's fees. 15 U.S.C. ง 1117. Exceptional cases include intentional and deliberate infringement. Hallmark Cards, Inc. v. Hallmark Dodge, Inc., 634 F.Supp. 990, 1001 (W.D.Mo.1986).
89. The Court finds that the defendants have willfully and intentionally infringed plaintiff's federally registered and well-known VASELINE and INTENSIVE CARE trademarks. The defendants' infringing intent is further demonstrated by the fact that defendants deliberately disregarded plaintiff's request to cease and desist their infringing activities. Under these circumstances, plaintiff is entitled to recover increased damages, an award of defendants' profits, and reasonable attorneys' fees. 15 U.S.C. ง 1117. In addition, plaintiff is entitled to an appropriate injunction pursuant to 15 U.S.C. งง 1116, 1118.
*680 90. Under the case law, awards of damages and profits serve different purposes. An award of damages compensates plaintiff for actual losses sustained. An accounting of the defendants' profits prevents unjust enrichment by the defendants by forcing them to disgorge profits obtained unlawfully. W.E. Bassett Co. v. Revlon, Inc., 435 F.2d 656, 664 (2d Cir. 1970); see Shen Mfg. Co. v. Suncrest Mills, Inc., 673 F.Supp. 1199 (S.D.N.Y.1987). Both forms of relief are specifically allowed by the statute. 15 U.S.C. ง 1117; Metric & Multistandard Components Corp. v. Metric's, Inc., 635 F.2d 710, 715 (8th Cir.1980).
91. Under the law, plaintiff may recover all damages sustained by Ansehl's sales of skin care lotion in its revised packaging to retailers, including Venture. Defendant Ansehl willfully induced the infringement of major retailers throughout the country by supplying these retailers with the confusingly similar packaging. Corning Glass Works v. Jeannette Glass Co., 308 F.Supp. 1321, 1326 (S.D.N.Y.), aff'd, 432 F.2d 784 (2d Cir.1970).
92. Plaintiff's actual damages are measured by the tort standard under which the infringer-tortfeasor is liable for all injuries caused to the plaintiff by the wrongful acts, whether or not actually anticipated or contemplated by the defendants when they performed the acts of infringement. Obear-Nester Glass Co. v. United Drug Co., 149 F.2d 671, 674 (8th Cir.1945); Heaton Distrib. Co. v. Union Tank Car Co., 387 F.2d 477, 486 (8th Cir.1967); 2 J. McCarthy, ง 30:27 at 509.
93. Evidence of actual confusion is proof of the fact of damage. 2 J. McCarthy, ง 30:27 at 511.
94. Plaintiff has demonstrated actual damage by clear and convincing evidence. First, Mrs. Sickles, a consumer, testified to her confusion in purchasing defendants' product. Mrs. Sickles testified that the product she mistakenly purchased was watery and of a lower quality than that of VICL, which she had been using for many years. It is significant that Mrs. Sickles was displeased with Ansehl's product and did not realize that it was not made by the manufacturer of VICL until advised of the correct facts by plaintiff. Such instances of actual confusion cause damage to plaintiff's reputation and the goodwill represented by the VASELINE and INTENSIVE CARE trademarks. Heaton Distrib., 387 F.2d at 485-86. It is also significant that the defendants' expert witness, Mr. Fred Edwards, confirmed that the events Mrs. Sickles testified to constituted actual confusion.
95. The evidence of defendants' intent to copy the VICL trade dress and to deceive consumers raises a presumption that confusion has occurred. Getty Petroleum v. Island Transp., 878 F.2d 650, 655-56 (2d Cir.1989); PPX Enter. v. Audiofidelity Enter., 818 F.2d 266, 272 (2d Cir.1987); My-T-Fine Corp. v. Samuels, 69 F.2d 76, 77 (2d Cir.1934); U-Haul Int'l v. Jartran, 601 F.Supp. 1140, 1149 (D.Ariz.1984); 2 J. McCarthy, ง 30:25 at 500.
96. Since plaintiff has proven actual confusion, it has demonstrated damage in fact. Once the fact of damage is proven, any inquiry beyond this point goes only to the amount of damage. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).
97. In cases of trademark infringement and unfair competition, where the nature of the injury may preclude exact ascertainment of the amount of damages, plaintiff is entitled to recover upon a showing of the extent of the damages through just and reasonable inference, even though the result may only be an approximation. Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562-63, 51 S.Ct. 248, 250-51, 75 L.Ed. 544 (1931); see also Restatement of Torts, ง 912 Comment (d) (1939). There is no question here that defendants made and sold confusingly similar packaging, used and promoted the similarities between their packaging and the revised VICL packaging to obtain business from retailers, and *681 caused consumer confusion thereby diverting sales from Chesebrough.
98. Plaintiff's damages may be measured by the profits lost by plaintiff because of defendants' infringement. 2 J. McCarthy, ง 30:27 at 311; Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513 (10th Cir.1987).
99. In addition to its damages, plaintiff is entitled to defendants' profits. 15 U.S.C. ง 1117. Where the defendants fail to present substantial evidence that any portion of their profits is not demonstrably attributable to the infringing product, plaintiff is entitled to all of defendants' profits. Bass Buster, Inc. v. Gapen Mfg. Co., Inc., 420 F.Supp. 144 (W.D.Mo.1976). See also Burger King Corporation v. Mason, 855 F.2d 779 (11th Cir.1988) (district court refused to allow willful infringers to offset profits from six restaurants by losses incurred at seven other restaurants); Polo Fashions, Inc. v. Dick Bruhn, Inc., 793 F.2d 1132 (9th Cir.1986) (the court of appeals instructed district court to award gross income from sale of willful infringer's products; recovery based on profits held inadequate to remove economic incentive to infringe).
100. Plaintiff is entitled to damages based on the units of Ansehl's infringing sales to Venture. During the time from January 1990 through September 4, 1991, Ansehl sold 2,495 dozen bottles of its product to Venture. Assuming plaintiff had sold those bottles to Venture, and applying plaintiff's profit figure of $18.73 per dozen bottles, plaintiff's lost profits would equal $46,731.35.
101. Ansehl's profits from its sale of the product to Venture equals $8,599.
102. Accordingly, plaintiff is entitled to damages based on the units of Ansehl's infringing sales to Venture in the amount of $55,330. This figure is trebled to $165,990.
103. It is also within this Court's discretion to grant prejudgment interest. American Honda Motor Co. v. Two Wheel Corp., 918 F.2d 1060, 1064 (2d Cir.1990); Gorenstein Enter. v. Quality Care โ USA, Inc., 874 F.2d 431, 436 (7th Cir.1989).
104. Since the Court has found that this is an exceptional case, an award of prejudgment interest is appropriate. American Honda v. Two Wheel, 918 F.2d at 1064; Gorenstein v. Quality Care, 874 F.2d at 436. An appropriate and convenient rate to use for prejudgment interest is the prime rate (10ฝ%) as of December 16, 1989, the date infringing sales commenced. Gorenstein v. Quality Care, 874 F.2d at 437. As noted previously, the Court will apply the prime rate at the time of infringement until the date of judgment.
105. Based upon the Pretrial Joint Stipulations, Kessler, after being served with the Complaint, continued to produce and supply the bottle to Ansehl. Therefore, there is no question that Kessler knowingly and purposely aided, induced and contributed to trademark and trade dress infringement. In addition, there is no question that Kessler enjoyed rewards and financial gain after having actual knowledge of plaintiff's claims. Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 854-55, 102 S.Ct. 2182, 2188-89, 72 L.Ed.2d 606 (1982) (manufacturer could be held liable if it intentionally induced a merchandiser down the chain to pass off a product as that of the trademark owners). See also Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 439 n. 19, 104 S.Ct. 774, 787 n. 19, 78 L.Ed.2d 574 reh'g denied, 465 U.S. 1112, 104 S.Ct. 1619, 80 L.Ed.2d 148 (1984); Sealy, Inc. v. Easy Living, Inc., 743 F.2d 1378, 1381-82 (9th Cir.1984) (wholesalers which sold unmarked non-Sealy mattress foundations with knowledge that dealers would sell the merchandise as Sealy foundations liable as contributory infringers).
106. Plaintiff is entitled to Kessler's proven gross sales of bottles which Kessler has admitted were used with infringing trade dress. This amount equals $115,632. Kessler has failed to particularize its expenses in manufacturing the bottles used for the infringement scheme. Therefore, under case law and 15 U.S.C. ง 1117, the Court awards plaintiff Kessler's gross *682 sales. Polo Fashions, Inc. v. Dick Bruhn, Inc., 793 F.2d 1132 (9th Cir.1986). See also Chesa International, Ltd. v. Fashion Associates, Inc., 425 F.Supp. 234 (S.D.N.Y. 1977), aff'd, 573 F.2d 1288 (Fed.Cir.1977) (defendant failed to produce cost data and failed to keep accurate records of total sales of infringing merchandise; court held that any doubts against actual assessment of damage must be resolved against defendant); Louis Vuitton S.A. v. Spencer Handbags Corp., 765 F.2d 966 (2d Cir. 1985).
107. Plaintiff is the owner of U.S. Trademark Registration Nos. 44,790, 140,345 and 864,662. The foregoing registrations have been registered upon the Principal Registry in the U.S. Patent and Trademark Office. The certificates of registration are prima facie evidence of the validity of the registered marks, of plaintiff's ownership of the marks, and of plaintiff's exclusive right to use the registered marks in commerce or in connection with the goods specified in the certificates. 15 U.S.C. ง 1057(b). In addition to being registered on the Principal Registry, U.S. Registration Nos. 44,790 and 140,345, for the mark VASELINE, and 864,662, for INTENSIVE CARE, have become incontestable pursuant to 15 U.S.C. ง 1065. Defendants have not contested either plaintiff's ownership in the foregoing registrations or the validity of these registrations. Therefore, these registrations are valid, subsisting and incontestable.
108. The test for trademark infringement is the likelihood of confusion test. This circuit has established a six factor test to determine likelihood of confusion. Squirtco, 628 F.2d 1086. These factors are: (1) similarity of the marks; (2) the degree to which the products compete with each other; (3) classes of, and degree of care likely to be exercised by, prospective purchasers; (4) evidence of actual confusion; (5) defendant's intent in adopting the mark; and (6) the strength of plaintiff's mark. Id.
109. Defendants have used the statement "Compare to Vaseline Intensive Care" on their packaging without the consent or authorization of plaintiff. Defendants have admitted that they selected the marks VASELINE and INTENSIVE CARE because they are well-known to the public. Defendants also admitted that they considered and rejected alternate phrases such as "Compare to National Brand." Defendants' use of the statement "Compare to Vaseline Intensive Care" constitutes a deliberate attempt to have the consumer identify the Venture product as originating from the same source as VICL. Charles of the Ritz v. Quality King, 636 F.Supp. 433, 437 (S.D.N.Y.1986).
110. In the present case, defendants have offered no credible evidence as to why the name Venture was omitted from the comparison statement and is not displayed on the front label of the revised Venture packaging. Defendants' contention that Venture has no right to use the name Venture on its packaging is overwhelmingly contradicted by the evidence.
111. Although the law permits competitors to use the trademarks of others in comparative advertising, SSP Agric. Equip., Inc. v. Orchard-Rite Ltd., 592 F.2d 1096, 1103 (9th Cir.1979), there is an overriding duty to prevent public confusion. 2 J. McCarthy, ง 25:14 at 266.
112. Confusing similarity of trademarks must be examined in the total context of a defendant's packaging. See Clorox Chem. Co. v. Chlorit Mfg. Corp., 25 F.Supp. 702 (E.D.N.Y.1938); 2 J. McCarthy, ง 23:18 at 99-100.
113. The use by defendants of the "Compare to" statement on packaging, which is confusingly similar to the appearance of the VICL packaging, is likely to cause confusion as to the source of defendants' Venture product. Charles of the Ritz v. Quality King, 636 F.Supp. at 437.
114. Under the law, defendants are liable for confusion as to sponsorship as well as confusion as to source. Mutual of Omaha Ins. Co. v. Novak, 836 F.2d 397, 398 (8th Cir.1987). Thus, if there is a likelihood that consumers would believe that defendants' product is endorsed by or authorized *683 by the manufacturer of VICL, there is infringement. Defendants' use of the phrase "Compare to Vaseline Intensive Care" is likely to cause consumers to believe that defendants' product is associated with, sponsored by, or endorsed by, or emanates from the manufacturer of VICL. 15 U.S.C. ง 1114.
115. Defendants have placed a disclaimer in small print on the lower portion of the back label of their packaging. The evidence shows that defendants placed this disclaimer on the packaging on their own volition. The voluntary act of placing a disclaimer on one's packaging constitutes a tacit admission that the use of plaintiff's trademarks, in the entire context of the packaging, is likely to confuse consumers. The Court finds that the Venture disclaimer is wholly inadequate to prevent consumer confusion and suggests a calculated effort by defendants to escape liability for infringement. Charles of the Ritz v. Quality King, 636 F.Supp. at 437; Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1093 and n. 9 (7th Cir.1988). See also Charles of the Ritz v. Quality King, 664 F.Supp. 152, 155-56 (S.D.N.Y.), aff'd, 832 F.2d 1317 (2d Cir.1987); Home Box Office, Inc. v. Showtime/The Movie Channel, Inc., 832 F.2d 1311, 1316 (2d Cir. 1987); Jacoby & Raskoff, Disclaimers as a Remedy for Trademark Infringement Litigation: More Trouble Than They Are Worth?, 76 Trademark Rept. 35 (1986).
116. Under the relevant provisions of the U.S. Trademark Act, plaintiff is entitled to injunctive relief, an accounting of defendants' profits, and an award of actual damages. The Court shall issue an appropriate injunction preventing defendants from using the marks VASELINE and INTENSIVE CARE in a misleading and confusing manner.
117. The Court has previously awarded to plaintiff trade dress damages and Ansehl's profits on merchandise with infringing trade dress sold to Venture. Since the infringing trademarks were used by defendants on packaging which also infringed plaintiff's trade dress, the Court believes it would be duplicative to award separate damages or profits to plaintiff for trademark infringement. However, plaintiff is clearly entitled to its actual damages and defendants' profits arising from the unauthorized use of its federally registered marks VASELINE and INTENSIVE CARE. 15 U.S.C. ง 1117.
118. The Court believes that an award of prejudgment interest is appropriate in these circumstances. Again, since the Court has already awarded plaintiff prejudgment interest on damages due to trade dress infringement and on defendants' profits due to their sales of merchandise with infringing trade dress, the Court will not separately award prejudgment interest for the damages and profits which are appropriate under trademark infringement.
119. Defendants Ansehl, Venture, May, and Kessler are joint tortfeasors, and as such, are jointly and severally liable for all of the defendants' infringing acts under Counts II and III of the Complaint. Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1023 (9th Cir.1985), cert. denied, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986).
120. Defendants Ansehl, Venture, and May are joint tortfeasors and as such are jointly and severally liable under Count I (patent infringement) of the Complaint. Jennings v. Dolan, 29 F. 861, 862 (S.D.N.Y.1887).

JUDGMENT
A memorandum dated this day is hereby incorporated and made a part of this judgment.
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that defendants May Department Stores, Inc. and the Benjamin Ansehl Company and their suppliers, officers, agents, servants, employees and attorneys, and those persons in active concert, privity or participation with them, or any of them, or any of their successors or assigns, be and hereby are permanently enjoined and restrained from manufacturing, using or selling aqueous cosmetic emulsions containing isoparaffin and alkyl phosphate salt in weight ratios of 1:1 up to *684 162.9:1, or from infringing United States Letters Patent No. 4,939,179.
IT IS HEREBY FURTHER ORDERED that defendants May Department Stores, Inc., Venture Stores, Inc., The Benjamin Ansehl Company, and Kessler Containers Ltd. and their suppliers, officers, agents, servants, employees and attorneys and those persons in active concert, privity or participation with them, or any of them, or any of their successors or assigns, be and hereby are permanently enjoined and restrained from:
1. using in connection with the manufacture, distribution, advertising, promotion, offering for sale or sale of any skin care lotion product or any other product, plaintiff's trademarks VASELINE or INTENSIVE CARE or any trademark, word, symbol or name which so resembles, copies, imitates or simulates plaintiff's VASELINE or INTENSIVE CARE trademark as to be likely to cause confusion, cause mistake or to deceive;
2. using in connection with the manufacture, distribution, advertising, promotion, offering for sale or sale of any skin care lotion product or related product in the bottle design of defendants complained of herein or any other bottle design which so resembles, copies, imitates or simulates the distinctive bottle design of plaintiff's products as to be likely to cause confusion, cause mistake or to deceive;
3. using in connection with the manufacture, distribution, advertising, promotion, offering for sale or sale of any skin care lotion product or related products with the defendants' trade dress or any other package design, which so resembles, copies, imitates or simulates the distinctive trade dress or overall package appearance of plaintiff's VASELINE INTENSIVE CARE products as to be likely to cause confusion, cause mistake or to deceive;
4. using in connection with the manufacture, distribution, advertising, promotion or offering for sale or sale of any skin care lotion product or related product, the statement "Compare to Vaseline Intensive Care" or any other statement which may lead the trade or public to believe that a product not originating with plaintiff is plaintiff's product or that defendant's product or any of defendants is associated with or connected with, sponsored by or approved by plaintiff;
5. using in connection with the manufacture, distribution, advertising, promotion or offering for sale or sale of any skin care lotion product or any related product, a "disclaimer" or any other statement which may lead the public to believe that defendants' products or any of the defendants are associated with or connected with, sponsored by or approved by plaintiff.
IT IS HEREBY FURTHER ORDERED that each defendant and those controlled by each defendant and those acting for each defendant is ordered to recall from all of their customers in the trade and deliver up to the court for destruction all labels, bottles, signs, prints, packages, wrappers, receptacles, advertisements and other written or printed material which bear plaintiff's trademarks VASELINE or INTENSIVE CARE, or which bear any other device, representation or statement in violation of the injunction herein requested by plaintiff, and that defendants be ordered to deliver up for destruction all plates, molds, matrices and other means of making the same.
IT IS HEREBY FURTHER ORDERED that each defendant shall file with the court and serve upon plaintiff a written report under oath setting forth the manner in which such defendant has complied with such injunction. This report shall be filed and served within 30 days after service upon such defendant of the injunction issued in this action.
IT IS HEREBY FURTHER ORDERED that defendant Ansehl's Count II (counterclaim for unfair competition due to plaintiff's alleged bad faith prosecution of its patent claim) is dismissed with prejudice.
IT IS HEREBY FURTHER ORDERED that plaintiff recover its damages of defendants Ansehl, Venture, and May for defendants' patent infringement in the amount *685 of $799,193, said amount being trebled to equal $2,397,579.
IT IS HEREBY FURTHER ORDERED that plaintiff recover its damages arising out defendants' acts of trademark and trade dress infringement in the amount of $55,330 based on Ansehl's infringing sales to Venture, said amount being trebled to equal $165,990, plus $115,632 based on Kessler's proven gross sales of infringing bottles.
IT IS HEREBY FURTHER ORDERED that plaintiff recover the taxable costs of this civil action, including reasonable attorney's fees commencing from the date this action was filed.
IT IS HEREBY FURTHER ORDERED that plaintiff recover prejudgment interest with respect to the patent infringement damages commencing July 3, 1990, until the date of judgment, based on the prime rate as of July 3, 1990 (10%). Plaintiff shall also recover prejudgment interest with respect to trademark and trade dress damages commencing December 16, 1989, until the date of this judgment, based on the prime rate as of December 16, 1989 (10ฝ%).
IT IS HEREBY FURTHER ORDERED that within 20 days of the date of this order, plaintiff shall file a documented request for attorney's fees and expenses, along with a brief (no more than fifteen pages in length) citing argument and authority in support of the request.
IT IS HEREBY FURTHER ORDERED that within 40 days of the date of this order, defendants may respond to plaintiff's documentation and brief filed in support of plaintiff's request for fees and costs.
IT IS HEREBY FURTHER ORDERED that within 55 days of the date of this order, plaintiff may file any reply to defendants' response.